Opinion
BROWN, J.
Almost 75 years ago, the United States Supreme Court held that the Locomotive Boiler Inspection Act (BIA or Act), now codified at 49 *474 United States Code section 20701 et seq., “extends to the design, the construction, and the material of every part of the locomotive and tender and of all appurtenances.” (Napier v. Atlantic Coast Line (1926) 272 U.S. 605, 611 [47 S.Ct. 207, 209, 71 L.Ed. 432] (Napier).) Since Congress intended the Act to occupy this field, “requirements by the states are precluded, however commendable or however different their purpose. [Citations.]” (272 U.S. at p. 613 [47 S.Ct. at p. 210].)
We conclude Napier continues to articulate the preemptive scope of the BIÁ and thus forecloses state law causes of action against locomotive manufacturers for defective design of their product. Accordingly, we affirm the judgment of the Court of Appeal in favor of defendant.
I. Factual and Procedural Background
Plaintiffs are former railroad employees, their spouses, and their survivors, who brought suit against defendant General Motors Corporation (defendant) for asbestos-related injuries.[1] Until 1984, defendant, through its electromotive division, manufactured diesel locomotives containing asbestos materials. The trial court granted judgment on the pleadings and summary judgment on the grounds the BIA preempted plaintiffs’ strict product liability and other state common law claims.
Relying on Napier, supra, 272 U.S. 605, the Court of Appeal affirmed. It expressly disagreed with the contrary decision in Viad Corp. v. Superior Court (1997) 55 Cal.App.4th 330 [64 Cal.Rptr.2d 136] (Viad), in which the Court of Appeal held that the federal preemption analysis in Medtronic, Inc. v. Lohr (1996) 518 U.S. 470 [116 S.Ct. 2240, 135 L.Ed.2d 700] (Medtronic) and Silkwood v. Kerr-McGee Corp. (1984) 464 U.S. 238 [104 S.Ct. 615, 78 L.Ed.2d 443] (Silkwood) had undermined the viability of Napier. We granted review to resolve this conflict in the law.
II. Discussion
“It has long been settled that Congress intended federal law to occupy the field of locomotive equipment and safety, particularly as it *475 relates to injuries suffered by railroad workers in the course of their employment.” (Law v. General Motors Corp. (9th Cir. 1997) 114 F.3d 908, 910 (Law).)
Napier, supra, 272 U.S. 605, is the genesis of this settled law. Napier involved a Georgia statute that prescribed an automatic door to the locomotive firebox and a Wisconsin statute that required a locomotive cab curtain. Invoking the BIA, interstate carriers brought suit to enjoin enforcement of these laws, which prohibited use within each state of locomotives not equipped with the specified devices. The question presented was “whether the Boiler Inspection Act has occupied the field of regulating locomotive equipment used on a highway of interstate commerce, so as to preclude state legislation.” (272 U.S. at p. 607 [47 S.Ct. at p. 207].)
The Supreme Court noted that as originally enacted in 1911, the BIA applied only to the boiler. (Napier, supra, 272 U.S. at p. 608 [47 S.Ct. at p. 208].) In 1915, however, it was extended “to ‘include the entire locomotive and tender and all parts and appurtenances thereof.’ ” (Ibid.) At the same time, Congress conferred upon the Interstate Commerce Commission (Commission) the responsibility and authority for promulgating rules and regulations to implement the Act (see 272 U.S. at pp. 608-609 [47 S.Ct. at p. 208]), authority now exercised by the Secretary of Transportation. Although the Commission had the power to designate requirements for locomotives, “it ha[d] made no order requiring either a particular type of fire box door or a cab curtain. Nor ha[d] Congress legislated specifically in respect to either device.” (Id. at p. 609 [47 S.Ct. at p. 208].)
The court acknowledged that “[e]ach device was prescribed by the state primarily to promote the health and comfort of engineers and firemen” and was therefore “a proper exercise of its police power . . . .” (Napier, supra, 272 U.S. at p. 610 [47 S.Ct. at p. 209].) Nevertheless, the requirements came within the scope of authority delegated to the Commission, i.e., regulation of “the equipment of locomotives.” (Id. at p. 612 [47 S.Ct. at p. 210].) “The fact that the Commission has not seen fit to exercise its authority to the full extent conferred [by regulating fire box doors or cab curtains], has no bearing upon the construction of the act delegating the power.” Since Congress “intended to occupy the field” of locomotive equipment (id. at p. 613 [47 S.Ct. at p. 210]), the standard set by the Commission must displace all state requirements notwithstanding a lack of conflict between that standard and state law. (Ibid.; cf. Southern Ry. Co. v. Lunsford (1936) 297 U.S. 398, 402 [56 S.Ct. 504, 506, 80 L.Ed. 740] [no liability under the BIA for failure to perform if locomotive part is not “definitely prescribed by lawful order” of the Commission].)
*476 The Ninth Circuit Court of Appeals recently explained the practical rationale for this determination: “This broad preemptive sweep is necessary to maintain uniformity of railroad operating standards across state lines. Locomotives are designed to travel long distances, with most railroad routes wending through interstate commerce. The virtue of uniform national regulation ‘is self-evident: locomotive companies need only concern themselves with one set of equipment regulations and need not be prepared to remove or add equipment as they travel from state to state.’ [Citations.]” (Law, supra, 114 F.3d at p. 910.) Moreover, “[a]part from compensating victims of accidents for their injuries, the purpose of tort liability is to induce defendants to conform their conduct to a standard of care established by the state. [Citation.] A railroad equipment manufacturer found to have negligently designed a braking system, for example, is expected to modify that system to reduce the risk of injury. If the manufacturer fails to mend its ways, its negligence may be adjudged willful in the next case, prompting a substantial punitive damages award. If each state were to adopt different liability-triggering standards, manufacturers would have to sell locomotives and cars whose equipment could be changed as they crossed state lines, or adhere to the standard set by the most stringent state. Either way, Congress’s goal of uniform, federal railroad regulation would be undermined. [Citation.]” (Id. at pp. 910-911; cf. Carrillo v. ACF Industries, Inc. (1999) 20 Cal.4th 1158, 1168-1169 [86 Cal.Rptr.2d 832, 980 P.2d 386] (Carrillo) [finding same rationale applies under the federal Safety Appliance Acts (49 U.S.C. § 20301 et seq.)].)
We agree with the Court of Appeal that the foregoing principles govern the viability of plaintiffs’ state law causes of action, which are based upon their claim defendant manufactured a defective product by utilizing asbestos in the design of its locomotives. As the court explained: “There is no doubt that the Secretary of Transportation has authority to regulate the design of the locomotive and could order the elimination of asbestos in locomotive components.[2] Imposing tort liability on railroad locomotive manufacturers clearly would affect ‘ “the design, the construction, and the material” of locomotives.’ ([Law, supra, 114 F.3d at p. 911, quoting Napier, *477 supra, 272 U.S. at p. 611 [47 S.Ct. at p. 209]].) This effect on interstate commerce would be both ‘direct and substantial.’ (English v. General Electric Co. [(1990)] 496 U.S. [72,] 85 [110 S.Ct. 2270, 2278-2279, 110 L.Ed.2d 65] [(English)].) As Law explains, the imposition of tort liability on railroad equipment manufacturers would force them to conform to design and construction standards imposed by the states. ‘This would transfer the regulatory locus from the Secretary of Transportation to the state courts—a result the BIA was clearly intended to foreclose. [Citation.]’ (Law, supra, at pp. 911-912, fn. omitted.)”
This conclusion follows numerous state and lower federal court decisions that have found the BIA preempts state tort damage actions.[3] We find this consensus further indication that Napier, supra, 272 U.S. 605, remains the controlling and dispositive authority on the preemptive scope of the BIA.
The United States Supreme Court has, moreover, impliedly affirmed that Napier remains viable. In Consol. Rail Corp. v. Pennsylvania Pub. Util., supra, 536 F.Supp. 653 (Consolidated Rail), the plaintiff railroad challenged a Pennsylvania statute that required locomotives to have speed recorders and indicators, contending the BIA preempted this state regulation. The state countered that when Congress enacted the Federal Railroad Safety Act (49 U.S.C. § 20101 et seq.), it “redistributed railroad regulatory authority so that the total-preemption test of the [BIA] is no longer valid.” (Consolidated Rail, supra, 536 F.Supp. at p. 654.) The district court rejected the state’s argument and found Napier controlling. (Id. at pp. 655-657.) Although Congress could have repealed or recodified the BIA, instead it “concluded that [the Act] was working well, and specifically determined to keep it independently in force ‘without change.’ ” (536 F.Supp. at p. 656, fn. omitted.) “If the Railroad Safety Act were to change the preemption test for those areas [already governed by the BIA], the states could expand their regulatory authority, allowing a new reservoir of differing, and possibly incompatible, railroad-safety law. This would run counter to Congress’s purpose of uniform national regulation. It is contrary to Congress’s purpose in passing the *478 Railroad Safety Act to allow the states to reoccupy fields from which they, previously had been displaced.” (Id. at pp. 656-657, fns. omitted.)
On appeal, the Supreme Court summarily affirmed. (Pennsylvania Public Utility Com. v. Consolidated Rail Corp., supra, 461 U.S. 912.) Such summary actions “should ... be understood as . . . applying principles established by prior decisions to the particular facts involved.” (Mandel v. Bradley (1977) 432 U.S. 173, 176 [97 S.Ct. 2238, 2241, 53 L.Ed.2d 199].) We thus have strong, if indirect, evidence Napier continues to control with respect to the scope of BIA preemption.
We also have evidence of legislative intent to this effect. As the court in Consolidated Rail, supra, 536 F.Supp. at pages 656-657, observed, when Congress enacted the Federal Railroad Safety Act in 1970, it specifically identified the BIA as among the “particular laws” governing railroad safety that “have served well,” so well that the Committee on Interstate and Foreign Commerce reviewing the matter “chose to continue them without change.” (H.R.Rep. No. 91-1194, 2d Sess. (1970), reprinted, in 1970 U.S. Code Cong. & Admin. News, p. 4105.) In discussing the role of the states in this area, the committee noted that “[a]t the present time where the Federal Government has. authority [e.g., under the BIA], with respect to rail safety, it preempts the field.” {Id., 1970 U.S. Code Cong. & Admin. News, p. 4108.) Additionally, when Congress recodified the BIA in 1994, the House Report stated “this bill makes no substantive change” and disclaimed any intent to “impair the precedent value of earlier judicial decisions . . (H.R.Rep. No. 103-180, 1st Sess. (1993), reprinted in 1994 U.S. Code Cong. & Admin. News, p. 822; see Finley v. United States (1989) 490 U.S. 545, 554-555 [109 S.Ct. 2003, 2009-2010, 104 L.Ed.2d 593].) In light of this explicit statement, we may “apply the presumption that Congress was aware of . . . earlier judicial interpretations [including Napier] and, in effect, adopted them. [Citations.]” (Keene Corp. v. United States (1993) 508 U.S. 200, 212 [113 S.Ct. 2035, 2043, 124 L.Ed.2d 118].)
Plaintiffs take the position that in the wake of Medtronic, supra, 518 U.S. 470, and Silkwood, supra, 464 U.S. 238, preemption analysis has evolved to narrow the proper construction and application of Napier. We consider this argument with caution in light of the United States Supreme Court’s clear admonition that “[i]f a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals [and state courts applying federal law] should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions.” (Rodriguez de Quijas v. Shearson/Am. Ex. (1989) 490 U.S. 477, 484 [109 S.Ct. 1917, 1921-1922, 104 *479 L.Ed.2d 526]; Agostini v. Felton (1997) 521 U.S. 203, 237 [117 S.Ct. 1997, 2017, 138 L.Ed.2d 391].)
In any event, we are unpersuaded on the merits. (Cf. Carrillo, supra, 20 Cal.4th at pp. 1167-1169 [rejecting the same argument in considering the preemptive effect of the federal Safety Appliance Acts].) Unlike the present case, in which the United States Supreme Court has found field preemption, Medtronic involved an express preemption provision contained in the Medical Device Amendments of 1976 (MDA). Construing the provision according to its terms, a plurality of the court found no congressional intent to oust all state common law negligence actions.[4] “If Congress intended such a result, its failure even to hint at it is spectacularly odd, particularly since Members of both Houses were acutely aware of ongoing product liability litigation.” (Medtronic, supra, 518 U.S. at p. 491 [116 S.Ct. at p. 2253].) “Unlike the statute construed in Cipollone [v. Liggett Group, Inc. (1992) 505 U.S. 504 [112 S.Ct. 2608, 120 L.Ed.2d 407]], for instance, pre-emption under the MDA does not arise directly as a result of the enactment of the statute; rather, in most cases a state law will be pre-empted only to the extent that the [federal Food and Drug Administration] has promulgated a relevant federal ‘requirement.’ ” (Medtronic, supra, at p. 496 [116 S.Ct. at p. 2255].) The state action was statutorily permitted because the regulatory agency had yet to impose any such requirement as to the device in question. (Id. at pp. 496-497 [116 S.Ct. atpp. 2255-2256].) In contrast to this permissible interplay of state and federal law, the Supreme Court has determined that the BIA occupies the field of locomotive equipment and thus any “requirements by the states are precluded, however commendable or however different their purpose. [Citations.]” (Napier, supra, 272 U.S. at p. 613 [47 S.Ct. at p. 210].)
In Silkwood, the high court found no intent to preclude an award of punitive damages under the Atomic Energy Act in light of the overall statutory scheme. (Silkwood, supra, 464 U.S. at pp. 250-255 [104 S.Ct. at pp. 622-625].) “By subsequent enactment of the Price-Anderson Act, Congress ‘assumed that persons injured by nuclear accidents were free to utilize existing state tort law remedies.’ Considering the historical record, ‘[t]his was true even though Congress was fully aware of the [Nuclear Regulatory] Commission’s exclusive . . . authority over safety matters.’ [Citation.]” (Carrillo, supra, 20 Cal.4th at p. 1168.) By contrast, like the Safety Appliance Acts at issue in Carrillo, the BIA “contains no evidence Congress *480 assumed or intended state remedies for design defects would be preserved. Given the goal of national uniformity, allowing such claims would substantially impair its function.” (Carrillo, supra, at pp. 1168-1169.)
Drawing on Medtronic and Silkwood, the Court of Appeal in Viad, supra, 55 Cal.App.4th 330, reached a contrary conclusion by defining the field preempted by the BIA to exclude plaintiffs’ state tort actions. It noted that “when the BIA was enacted, a railroad employee would have had no right of action against the manufacturer.” (Viad, supra, at p. 338; see MacPherson v. Buick Motor Co. (1916) 217 N.Y. 382 [111 N.E. 1050].) The court reasoned that since “[t]he doctrine of strict liability of a manufacturer was not established until much later” (Viad, supra, 55 Cal.App.4th at p. 338; see Greenman v. Yuba Power Products, Inc. (1963) 59 Cal.2d 57 [27 Cal.Rptr. 697, 377 P.2d 897, 13 A.L.R.3d 1049]), Congress could not have intended to preempt such actions. (Viad, supra, 55 Cal.App.4th at p. 338.) But this reasoning proves too much: Equally logically, Congress could not have intended to preserve that which did not exist. Furthermore, the BIA was enacted as an amendment to the Federal Employers’ Liability Act (FELA) (45 U.S.C. § 51 et seq.), which significantly expanded the ability of railroad workers to seek recourse for on-the-job injuries and has been broadly interpreted. (See Urie v. Thompson (1949) 337 U.S. 163, 180-191 [69 S.Ct. 1018, 1029-1035, 93 L.Ed. 1282, 11 A.L.R.2d 252]; Viad, supra, 55 Cal.App.4th at p. 338 [“One of the primary purposes of FELA was to eliminate defenses to tort liability and to facilitate recovery. [Citation.]”].) Having enlarged the basis for recovery under federal law, Congress reasonably could have intended to restrict it under state law.
Moreover, unlike the situation in Silkwood, the field occupied by the BIA must necessarily extend to state law tort recovery. That is, the BIA cannot remove “the design, the construction, and the material of every part of the locomotive and tender and of all appurtenances” from the purview of state regulation (Napier, supra, 272 U.S. at p. 611 [47 S.Ct. at p. 209]) without concomitantly precluding tort actions premised on a defect in such design, construction, or material. Any other result would place regulation of these requirements in the hands of state juries, thereby constraining the Secretary of Transportation’s regulatory authority and undermining the goal of uniformity. (Law, supra, 114 F.3d at pp. 910-911; cf. Baltimore & Ohio R. Co. v. Groeger (1925) 266 U.S. 521, 530-531 [45 S.Ct. 169, 173, 69 L.Ed. 419].)
In arguing that the scope of the BIA does not extend to their claims, plaintiffs also rely on English, supra, 496 U.S. 72. In that case, the Supreme Court held that the field preempted by federal law did not extend to a state law cause of action for intentional infliction of emotional distress arising out *481 of actions by the plaintiff’s employer allegedly taken in retaliation for her nuclear safety complaints. In reaching this conclusion, the court made clear that determining an issue of field preemption focuses not only on the purpose of the state law in question but its “actual effect” with respect to federal regulation. (Id. at p. 84 [110 S.Ct. at p. 2278].) “[T]o fall within the pre-empted zone, [the state law] must have some direct and substantial [rather than remote] effect” on the regulated subject matter. (Id. at p. 85 [110 S.Ct. at p. 2278].) This standard does not avail plaintiffs here. We do not hesitate to conclude that allowing their state law claims would have a direct and substantial effect on the uniformity of locomotive design, construction, and material mandated by Congress through the BIA.
Plaintiffs contend our determination inverts the burden of proof on preemption, which places the onus on the defendant to establish congressional intent to eclipse state law. (Medtronic, supra, 518 U.S. at p. 486 [116 S.Ct. at pp. 2250-2251].) Their contention assumes we write on a clean slate, but we do not. Napier has long established that Congress “intended to occupy the field” of locomotive equipment (Napier, supra, 272 U.S. at p. 613 [47 S.Ct. at p. 210]), a field that extends to the “design” of such equipment. (Id. at p. 611 [47 S.Ct. at p. 208].) Thus, defendant has carried its burden. To the extent plaintiffs seek to avoid the impact of Napier by arguing Medtronic and Silkwood have sufficiently altered the preemption landscape to warrant a different conclusion, they assume the burden of demonstrating a contrary congressional intent. Applying the analysis derived from Carrillo, we find they have failed to do so. (Carrillo, supra, 20 Cal.4th at pp. 1167-1169.)
Plaintiffs cite “ ‘the assumption that the historic police powers of the States [relating to matters of health and safety] were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.’ ” (Medtronic, supra, 518 U.S. at p. 485 [116 S.Ct. at p. 2250].) We question plaintiffs’ premise that rail workers’ health and safety are concerns primarily within the historic police powers of the states. “Railroads have been subject to comprehensive federal regulation for nearly a century. . . . There is no comparable history of longstanding state regulation ... of the railroad industry.” (Transportation Union v. Long Island R. Co. (1982) 455 U.S. 678, 687-688 [102 S.Ct. 1349, 1355-1356, 71 L.Ed.2d 547], fns. omitted.) This observation applies equally to safety matters, as the enactment of the BIA and the Safety Appliance Acts in the early 1900’s attests. In this regard, uniformity has long been the congressional touchstone. (See, e.g., Penna. R. R. Co. v. Pub. Service Comm. (1919) 250 U.S. 566, 569 [40 S.Ct. 36, 37, 63 L.Ed. 1142] [“The subject-matter in this instance [rail safety appliances] is peculiarly one that calls for uniform law . . . .”].) The statutory scheme, as construed by the courts and reaffirmed by Congress, *482 reflects that any historic state police powers must yield to this clear and manifest purpose. Moreover, the Supreme Court considered this factor in Napier, but nevertheless determined the BIA occupies the entire field of locomotive equipment regardless of the salutary purpose of any additional state requirement. (Napier, supra, 272 U.S. at pp. 610-611 [47 S.Ct. at pp. 208-209].)
It is also immaterial to our analysis that plaintiffs’ causes of action raise no conflict with any provision of the BIA or its implementing regulations, that they will not impair nationwide uniformity, or that they are consistent with the safety purposes underlying the BIA. (Napier, supra, 272 U.S. at pp. 610-611 [47 S.Ct. at pp. 208-209]; cf. Southern Ry. Co. v. R.R. Com., Indiana (1915) 236 U.S. 439, 448 [35 S.Ct. 304, 305-306, 59 L.Ed. 661] [rejecting argument for nonpreemption based upon lack of conflict between state regulation and Safety Appliance Acts].) “[T]he power delegated to the Commission by the Boiler Inspection Act as amended is a general one. It extends to the design, the construction, and the material of every part of the locomotive and tender and of all appurtenances.” (Napier, supra, 272 U.S. at p. 611 [47 S.Ct. at p. 209].) Having occupied the field, Congress left no area within which states may act. In essence, these arguments conflate field preemption with conflict preemption. (Cf. Carrillo, supra, 20 Cal.4th at p. 1166; see also English, supra, 496 U.S. at p. 79, fn. 5 [110 S.Ct. at p. 2275] [“[F]ield pre-emption may be understood as a species of conflict pre-emption: A state law that falls within a pre-empted field conflicts with Congress’ intent (either express or plainly implied) to exclude state regulation.”].)
Nor do we accord significance to the absence of any specific regulation of asbestos by the Secretary of Transportation or the FRA. (See Napier, supra, 272 U.S. at p. 613 [47 S.Ct. at p. 210].) Even assuming plaintiffs’ factual premise (see ante, fn. 2; see also 49 C.F.R. §§ 229.25(b), 229.41, 229.83, 229.89 (1998) [addressing locomotive insulation and related matters]), the particulars of the regulatory scheme are entirely within both the purview and the prerogative of the Secretary of Transportation. (Napier, supra, at pp. 612-613 [47 S.Ct. at pp. 209-210].) “ ‘[T]he will of Congress upon the whole subject is as clearly established by what it had not declared, as by what it has expressed.’ ” (Southern Ry. Co. v. R.R. Com., Indiana, supra, 236 U.S. at p. 447 [35 S.Ct. at p. 305].) In effect, plaintiffs’ lawsuits would have a retroactive regulatory effect by now allowing design control that the BIA denied the state at the time of manufacture.
We also find no merit in plaintiffs’ contention that Napier addresses only state legislation regulating locomotive equipment, not common law tort *483 remedies. (See, e.g., Napier, supra, 272 U.S. at pp. 607, 613 [47 S.Ct. at pp. 207-208, 210].) The United States Supreme Court has long rebuffed efforts to draw this artificial distinction: “Our concern is with delimiting areas of conduct which must be free from state regulation if national policy is to be left unhampered. Such regulation can be as effectively exerted through an award of damages as through some'form of preventive relief. The obligation to pay compensation can be, indeed is designed to be, a potent method of governing conduct and controlling policy. Even the States’ salutary effort to redress private wrongs or grant compensation for past harm cannot be exerted to regulate activities that are potentially subject to the exclusive federal regulatory scheme.” (San Diego Unions v. Garmon (1959) 359 U.S. 236, 246-247 [79 S.Ct. 773, 780, 3 L.Ed.2d 775]; see Law, supra, 114 F.3d at pp. 910-911.) Contrary to plaintiffs’ implication, the compelling need for uniform locomotive equipment standards prevents state remedies for injured persons from coexisting with federal regulation.
We are equally unpersuaded the BIA does not apply to locomotive manufacturers. (See 49 U.S.C. § 20701 [BIA speaks expressly to “railroad carrier[s]” and not manufacturers]; but see id., § 21302(a) [liability for violation of the Act applies to any “person,” including manufacturers]; former 45 U.S.C. § 34, as amended by Pub.L. No. 100-342, § 14(7)(A) (June 22, 1988) 102 Stat. 624; Viad, supra, 55 Cal.App.4th at p. 334.) “This distinction [between locomotive manufacturers and operators] is without significance. The BIA preempts any state action that would affect ‘the design, the construction, and the material’ of locomotives. [Citation.] Imposing tort liability on railroad equipment manufacturers would do just that, by forcing them to conform to design and construction standards imposed by the states. This would transfer the regulatory locus from the Secretary of Transportation to the state courts—a result the BIA was clearly intended to foreclose. [Citation.]” (Law, supra, 114 F.3d at pp. 911-912, fn. omitted; cf. Taylor AG Industries v. Pure-Gro (9th Cir. 1995) 54 F.3d 555, 561, fn. 3 [“analysis focuses not on whom the legal duty is imposed, but on whether the legal duty constitutes a state law requirement” already covered by federal law].) Sanctioning state common law actions against manufacturers would raise the same concerns for impairing the nationwide uniformity essential to the regulation of railroads as would sanctioning such actions against operators. (Law, supra, 114 F.3d at pp. 910-911; cf. Carrillo, supra, 20 Cal.4th at p. 1169.)[5]
Finally, plaintiffs argue that even if their defective design claims fall, their failure-to-wam causes of action survive the BIA’s preemptive sweep because the statute does not address warning or instruction labels. We agree *484 with the Ninth Circuit Court of Appeals that “[a]s for warning requirements, these too are within the scope of the Secretary’s authority—an authority which the Secretary has often invoked. [Citations.]” (Law, supra, 114 F.2d at p. 911; cf. Carrillo, supra, 20 Cal.4th at p. 1165, fn. 1 [Safety Appliance Acts preempt failure-to-wam claims]; Ouellette v. Union Tank Car Co. (D.Mass. 1995) 902 F.Supp. 5, 10 [same, Federal Railroad Safety Act].) Moreover, “[t]his argument begins from an incorrect premise: the relevant inquiry is not whether a label falls under the BIA but whether [the subject of such a label] does.” (Oglesby v. Delaware & Hudson Railway Co., supra, 180 F.3d at p. 461.) Pertinent regulations address the question of locomotive insulation (see, e.g., 49 C.F.R. §§ 229.25(b), 229.41, 229.83, 229.89 (1998)), thus any failure-to-warn claims relating to that subject come within our previous analysis.
Disposition
The judgment of the Court of Appeal is affirmed.[6]
George, C. J., Kennard, J., Baxter, J., Werdegar, J., and Chin, J., concurred.

 As the Court of Appeal detailed: “Harry Goodyear, Victor Hellquist, Robert Scheiding, Gaylord Blackburn and Billy Umphriss worked in or around locomotives at some time between the 1940’s and the 1980’s. Plaintiffs in each of these five actions alleged below that [defendant’s] locomotives and related equipment were defective because they released asbestos fibers into the atmosphere where these railroad employees worked and onto their clothing. Goodyear and Hellquist are wrongful death and survival lawsuits brought by the spouses of workers who died as a result of asbestos illnesses. Scheiding, Blackburn and Umphriss were filed by the injured employees themselves. The complaints in each case allege against [defendant] causes of action for negligence, strict liability, and false representation, as well as wrongful death and survival in Goodyear and Hellquist and negligent infliction of emotional distress and loss of consortium in Scheiding, Blackburn and Umphriss.” (Fns. omitted.)

 It appears the Federal Railroad Administration (FRA) has, in fact, addressed the question of asbestos in locomotives. In a 1996 report to Congress, the FRA noted that the two primary builders, one being defendant, had 10 years earlier ceased to use friable asbestos and were “careful to avoid the use of asbestos in new and rebuilt locomotives.” (FRA, U.S. Dept, of Transportation, Rep. to Congress, Locomotive Crashworthiness and Cab Working Conditions (Sept. 1996) p. 12-9.) Moreover, the FRA “could find no evidence of asbestos being a health problem for crews of older locomotives." (Ibid.) It determined that final regulations to protect workers from exposure to asbestos published by the Occupational Safety and Health Administration were sufficient to “ensure effective long-term management of asbestos.” (Id. at p. 10-11.) Accordingly, it “recommend[ed] no action be taken on the issue of asbestos in locomotives, except to the extent any new information requires that the issue be reopened.” *477 (Id. at p. 12-9.) We grant the parties’ request to take judicial notice of these portions of the FRA’s report. (See Evid. Code, § 452, subd. (c).)

 E.g., Oglesby v. Delaware & Hudson Railway Co. (2d Cir. 1999) 180 F.3d 458, 460-462; Springston v. Consolidated Rail Corp. (6th Cir. 1997) 130 F.3d 241, 244-245; Missouri Pacific R.R. v. Railroad Com’n of Texas (5th Cir. 1988) 850 F.2d 264, 268; Marshall v. Burlington Northern, Inc. (9th Cir. 1983) 720 F.2d 1149, 1151-1152; Consol. Rail Corp. v. Pennsylvania Pub. Util. (E.D.Pa. 1982) 536 F.Supp. 653, affirmed (3d Cir. 1982) 696 F.2d 981, affirmed sub nom. Pennsylvania Public Utility Com. v. Consolidated Rail Corp. (1983) 461 U.S. 912 [103 S.Ct. 1888, 77 L.Ed.2d 280]; Key v. Norfolk Southern Ry. Co. (1997) 228 Ga.App. 305 [491 S.E.2d 511]; In re Train Collision at Gary, Indiana (Ind.Ct.App. 1996) 670 N.E.2d 902, 910-911; Carter v. Consol. Rail Corp. (1998) 126 Ohio App.3d 177 [709 N.E.2d 1235],

 In his concurring opinion, Justice Breyer did not disagree with this determination. (Medtronic, supra, 518 U.S. at pp. 503-508 [116 S.Ct. at pp. 2259-2262] (conc. opn. of Breyer, J.).) The remaining justices concluded the state common law damages actions did impose “requirements” within the meaning of the MDA and were therefore preempted. (Medtronic, supra, 518 U.S. at p. 509 [116 S.Ct. at p. 2262] (conc. & dis. opn. of O'Connor, J.).)

 Plaintiffs further contend the scope of the BIA extends only to the on-line operation of locomotives and therefore does not govern redress for their injuries, which resulted from work on the equipment in roundhouses and repair shops. (See 49 U.S.C. § 20701; see also id.., § 20902(a)(1) [authorizing Secretary of Transportation to investigate accidents “occurring on *484 the railroad line”].) Plaintiffs did not submit this argument until their petition for rehearing in the Court of Appeal, and the court did not address it. Accordingly, we find it was not timely raised and will not consider it further. (Cal. Rules of Court, rule 29(b)(1).)

 To the extent it is inconsistent with our analysis and holding, we disapprove Viad, supra, 55 Cal.App.4th 330.