255 F.3d 1205 (9th Cir. 2001)
 CHRISTOPHER FORRESTER, Plaintiff-Appellant,
v.
AMERICAN DIESELELECTRIC, INC.; AMERICAN HOIST & DERRICK, INC., a Minnesota corporation; AMERICAN CRANE CORP., a North Carolina corporation; OHIO LOCOMOTIVE CRANE CO., INC., anOhio corporation; AMDURA CORPORATION, a Delaware corporation, Defendants-Appellees.
 No. 99-35073
 UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT
 Argued and Submitted December 8, 2000 Seattle, Washington
Filed July 10, 2001
 
 1
 John R. Connelly, Jr. and Timothy A. Scott, Gordon, Thomas, Honeywell, Malanca, Peterson & Daheim, P.L.L.C., Tacoma, Washington, for the plaintiff-appellant.
 
 
 2
 Marcia E. Hurt, Cleveland, Ohio, attorney for the defendants-appellees.
 
 
 3
 Appeal from the United States District Court for the Western District of Washington, Franklin D. Burgess, District Judge, Presiding, D.C. No.CV-97-05617-FDB
 
 
 4
 Before: Betty B. Fletcher and Raymond C. Fisher, Circuit Judges, and William W Schwarzer,* Senior District Judge
 
 SCHWARZER, Senior District Judge:
 
 5
 Plaintiff Christopher Forrester suffered severe injuries when an American Model 840DE locomotive crane operated by his employer, General Metals, dragged a large metal beam over his leg. We must decide whether the Locomotive Inspection Act (the Act), 49 U.S.C. §§ 20701-20703 (West 2000), preempts Forrester's state law product liability claims against the locomotive crane's manufacturer based on the absence of an automatic audible warning device.
 
 FACTUAL AND PROCEDURAL BACKGROUND
 
 6
 On October 20, 1994, Forrester was badly injured in an industrial accident in General Metals' Tacoma, Washington scrapyard. Forrester's job as a "burner" required him to use a torch to cut large pieces of scrap metal into smaller pieces. On that day a locomotive crane, which traveled around the scrapyard on tracks, was moving metal beams into the "burn area" where Forrester was working. The locomotive crane, which was equipped with an air horn but not an "automatic bell and ringer" that would sound whenever the locomotive crane moved, reversed into Forrester's immediate vicinity and dragged the metal beam with it. Forrester's leg was crushed and ultimately had to be amputated. American Hoist & Derrick, the manufacturer of the locomotive crane, offered a bell and ringer system as an option, but General Metals chose to purchase the crane without it. No federal regulations require such a warning system on a locomotive crane.
 
 
 7
 Forrester brought this action against the appellees, American Crane Corporation, American Hoist & Derrick Company and its successor, Amdura Corporation, and Ohio Locomotive Crane Co., the manufacturers and sellers of the locomotive crane, alleging violations of Washington's Products Liability Act, WASH. REV. CODE ANN. §§ 7.72.010-.060 (West 2000).[1] His principal allegation was that without an automatic warning system the locomotive crane is unreasonably dangerous and therefore defectively designed. The district court granted summary judgment for appellees, holding that Forrester's claims were preempted by the Act. Forrester appeals from the judgment.
 
 
 8
 The district court had jurisdiction under 28 U.S.C. § 1332. We have jurisdiction pursuant to 28 U.S.C. § 1291. Our review of the summary judgment is de novo. See Lopez v. Smith, 203 F.3d 1122, 1131 (9th Cir. 2000).
 
 DISCUSSION
 
 9
 A. The Locomotive Crane is Subject to Regulation Under the Locomotive Inspection Act
 
 
 10
 In the Act (also known as the Boiler Inspection Act), Congress established requirements governing the use of locomotives. In substance, it provides that a railroad carrier may
 
 
 11
 use a locomotive only when it is in proper condition, safe to operate without unnecessary danger of personal injury, and inspected as required by the Act and regulations prescribed by the Secretary of Transportation (Secretary). 49 U.S.C. § 20701 (2000). A railroad carrier includes anyone providing nonhighway ground transportation that runs on rails or electromagnetic guideways and is not limited to railroad common carriers. Id. § 20102. The Secretary, acting through the Federal railroad Administration (FRA), is responsible for the administration and enforcement of railroad safety laws, including the Act. Id. §§ 103, 20103(a); 49 C.F.R. § 1.49(c)(5) (2000). Thus, Congress has established a comprehensive regulatory framework governing railroad safety, including the safe operation of locomotives.
 
 
 12
 Acting under its statutory authority, the FRA has promulgated Railroad Locomotive Safety Standards (Standards). 49 C.F.R. pt. 229 (1999). The Standards establish requirements governing the inspection, design, equipment, and operation of locomotives. They define a locomotive as "a piece of on-track equipment other than . . . specialized maintenance or other similar equipment with . . . propelling motors . . . designed for moving other equipment." 49 C.F.R. § 229.5(k) (1999). Neither the Act nor the regulations by their terms shed light on the specific question whether a locomotive crane is a locomotive within the meaning of the Act.
 
 
 13
 The FRA, however, has interpreted the Act to cover locomotive cranes. A recent Memorandum from the FRA's Director of Safety Assurance and Compliance to all Regional Administrators and others provides compliance and enforcement guidelines for Burro Cranes, a particular make of locomotive crane. The Memorandum acknowledges that the definition in § 229.5(k) excludes Burro Cranes from the Safety Standards as specialized maintenance equipment, but states that they are subject to the statutory requirements of the Act. The Memorandum spells out the various safety requirements applicable to Burro Cranes, such as those covering brakes and couplers, and concludes:
 
 
 14
 Despite the fact that the Burro Crane is excluded from the definition of "locomotive" under § 229.5(l) [sic (k)] of the Locomotive Safety Standards as a piece of specialized maintenance equipment and is not subject to those Standards, the Burro Crane is nevertheless subject to the statutory requirements of the Locomotive Inspection Act, in particular, the requirement that it be safe. In the preamble to the final locomotive rules, FRA explicitly recognizes the applicability of the Act by stating that "FRA will continue to implement the basic statutory safety requirements with respect to such work equipment by using the Special Notice for Repair when appropriate."
 
 
 15
 Burro Crane Requirements, Dep't of Transp. Mem. (June 15, 1998) (emphasis added).
 
 
 16
 When the FRA adopted the Locomotive Safety Standards in the rule making proceedings to which the Memorandum refers, it expressly acknowledged that locomotive cranes, as specialized work equipment, would not be considered locomotives subject to those standards. See Railroad Locomotive Safety Standards and Locomotive Inspection, 45 Fed. Reg. 21,093 (Mar. 31, 1980). At the same time, however, the FRA made it clear that it would continue to implement statutory safety requirements with respect to such equipment. Id. While the FRA's interpretive memorandum is entitled to respect, see Christensen v. Harris County, 529 U.S. 576, 120 S. Ct. 1655, 1663 (2000), Chevron deference applies to an agency intepretation contained in a regulation. Id.; see Chevron U.S.A. v. Natural Res. Def. Council, 467 U.S. 837, 843-44 (1984) (stating that if Congress has "left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation" and the regulation is to be given controlling weight unless arbitrary, capricious, or manifestly contrary to the statute). The FRA's determination of its jurisdiction over locomotive cranes in its rule making proceedings, while not incorporated in the regulations themselves, must at least be given substantial weight. See also United Transp. Union v. Skinner, 975 F.2d 1421, 1425 (9th Cir. 1992) (stating that where the FRA's interpretation is based on a permissible construction of the statute, the court is required to defer to the reasonable interpretation of the agency charged with administering the statute).
 
 
 17
 In arguing that his claim is not subject to preemption because the locomotive crane that injured him was not used as a locomotive, Forrester relies principally on Garcia v. Burlington Northern Railroad Co., 818 F.2d 713 (10th Cir. 1987) (holding that tamper used to align tracks was not a locomotive subject to the Act). There the court reasoned that "courts have consistently held that a vehicle will be a locomotive only if it is used as a locomotive," meaning that it "perform[s] a locomotive function." Id. at 714. This reasoning, however, fails to take into account the FRA's own interpretation that its regulatory jurisdiction under the Act extends to locomotive cranes. Whether the FRA would consider a tamper to fall within the class of work equipment subject to regulation is a question we need not answer here. What is clear, however, is that the FRA does not gauge its regulatory jurisdiction over locomotive cranes with reference to how they are used.
 
 
 18
 Forrester also contends that the special notice of repair to which the FRA rule making refers would not apply to appellees' locomotive crane because FRA inspectors do not inspect railroads in industrial installations such as General Metals'. This is currently the case: In an Interim Statement of Agency Policy concerning enforcement of federal safety laws, the FRA stated that its regulations exclude railroads whose entire operations are confined to an industrial installation. 49 C.F.R. pt. 209, App. A, at 40-41 (1999). However, it concludes:
 
 
 19
 It is important to note that FRA's exercise of its regulatory authority on a given matter does not preclude it from subsequently amending its regulations on that subject to bring in railroads originally excluded . . . . [Moreover,] a railroad excluded from the reach of any of FRA's regulations is fully within the reach of FRA's emergency order authority.
 
 
 20
 Id. at 41.
 
 
 21
 In sum, locomotive cranes are excluded from the Locomotive Safety Standards. However, even though the FRA has not exercised its regulatory authority to the full extent, it treats locomotive cranes as subject to regulation under the Act. See Oglesby v. Del. & Hudson Ry. Co., 180 F.3d 458, 460 (2d Cir. 1999) (quoting Napier v. Atl. Coast Line R.R. Co., 272 U.S. 605, 613 (1926)). Given that the Act applies, the remaining question is whether it preempts Forrester's common law product liability claims.
 
 
 22
 B. The Locomotive Inspection Act Preempts Forrester's Common Law Claims
 
 
 23
 In Law v. General Motors Corp., 114 F.3d 908 (9th Cir. 1997), we held, following the leading case of Napier v. Atlantic Coast Line R.R. Co., 272 U.S. 605 (1926), that the Act preempts common-law claims by railroad employees against a locomotive manufacturer for defective design, construction, and failure to warn. We reasoned that "[t]his broad preemptive sweep is necessary to maintain uniformity of railroad operating standards across state lines . . . . If each state were to adopt different liability-triggering standards . . . Congress's goal of uniform, federal railroad regulation would be undermined." Id. at 910-11.
 
 
 24
 Forrester argues that Law preempts only claims by railroad employees, not persons who have no remedy under the Federal Employers' Liability Act (FELA).[2] 45 U.S.C. §§ 51-60. The preemptive effect of the Act, however, has never been limited to suits by railroad employees. In Napier, the Supreme Court decided broadly that "the Boiler Inspection Act has occupied the field of regulating locomotive equipment used on a highway of interstate commerce so as to preclude state legislation." Napier, 272 U.S. at 606; see Mo. Pac. R.R. v. R.R. Comm'n of Tex., 850 F.2d 264, 268 (5th Cir. 1988). Indeed, we have held a common-law claim of a motorist against a railroad arising out of a crossing accident, to the extent it was based on the railroad's inadequate warning devices, preempted by the Act. Marshall v. Burlington N., Inc., 720 F.2d 1149 (9th Cir. 1983); First Sec. Bank v. Union Pac. R.R., 152 F.3d 877 (8th Cir. 1998) (same); see also Springston v. Consol. Rail Corp., 130 F.3d 241 (6th Cir. 1997) (same).
 
 
 25
 Although we also held in Law that preemption under the Act applies to claims against manufacturers as well as to claims against railroads, Law, 114 F.3d at 912; see also Oglesby v. Del. & Hudson Ry. Co., 180 F.3d 458 (2d Cir. 1999) (same); Scheiding v. Gen. Motors Corp., 993 P.2d 996, 1003 (Cal. 2000) (same), Forrester argues that Law should not control. He first notes that in Law the preempted claims were asserted by railroad employees who had access to the "strong medicine" of the FELA. Law, 114 F.3d at 912. He argues quite persuasively that the primary factor we cited as an incentive for locomotive manufacturers to comply with the Act their customers' potential liability under the FELA does not operate where the customers, such as General Metals, are not common carrier railroads and therefore not exposed to FELA liability. Id. at 911-12. As Forrester points out, until the 1988 amendment extending the Act to noncom-mon carriers, the Act and the FELA were in effect read as in pari materia, i.e., the FELA was a vehicle for enforcing the safety requirement of the Act. He would have us carve out of the broad preemptive sweep of Napier a category of railroad equipment which, though subject to FRA jurisdiction, is not operated by railroad common carriers.
 
 
 26
 Although we are troubled that our refusal might afford locomotive crane manufacturers broad immunity from tort liability, we reject the invitation for several reasons. We think first that the force of the sweeping preemption rule under Napier remains unimpaired, see, e.g., Consol. Rail Corp. v. Pa. PUC, 536 F. Supp. 653, 654 (E.D. Pa.) (rejecting the contention that in light of redistribution of railroad regulatory authority, the total preemption test of the Act is no longer valid), aff'd, 696 F.2d 981 (3d Cir. 1982), aff'd, 461 U.S. 912 (1983). None of the Court's more recent preemption cases have questioned the authority of Napier and, in any event, the rule is too well established to permit such a qualification by a lower court. See Rodriguez de Quijas v. Shearson/Am. Express, Inc., 490 U.S. 477, 484 (1989) (stating that court of appeals should follow directly controlling Supreme Court precedent and leave the prerogative of overruling it to the Court). Second, because the purpose of the Act is not necessarily limited to protecting railroad employees but embraces the safety of the public as well, see Urie v. Thompson, 337 U.S. 163, 189 (1949) (stating that "the prime purpose of the [Act] was the protection of railroad employees and perhaps also of passengers and the public at large"), there is no reason to restrict its preemptive force to FELA cases. Finally, the exception Forrester urges is inconsistent with Congress's purpose when, in extending the Secretary's railroad safety jurisdiction under the Act to include all forms of ground transportation running on rails, it brought noncommon-carrier locomotive cranes within that jurisdiction. See House Conf. Rep. No. 100-637, at 24 (1988), reprinted in 1988 U.S.C.C.A.N. 708, 713.
 
 
 27
 For these reasons, we conclude that Napier controls and we affirm the judgment.
 
 
 28
 AFFIRMED.
 
 
 
 Notes:
 
 
 *
 The Honorable William W Schwarzer, Senior United States District Judge for the Northern District of California, sitting by designation.
 
 
 [1]
 Forrester also named American Dieselelectric, Inc., which is not a separate entity. Instead, American Dieselelectric, Inc. was a trademark for dieselelectric-powered locomotive cranes manufactured by American Hoist & Derrick Company.
 
 
 [2]
 Although proof of a violation of the Act subjects a defendant to civil penalties, it does not confer a private right of action. Instead, the FELA provides for recovery of damages by a person injured as a result of a violation of the Act. See Lilly v. Grand Trunk R.R. Co., 317 U.S. 481, 485 (1943). However, the right to sue for damages under the FELA is limited to employees of a railroad common carrier engaged in interstate commerce. See 45 U.S.C. § 51.