Joseph J. WAYMIRE and Linda Waymire, his wife, Plaintiffs,

v.

NORFOLK AND WESTERN RAILWAY COMPANY, a corporation, and Hogan Motor Leasing, Inc., a corporation, and Hogan Transport, Inc., a corporation, and Jay Werner Bussler, Defendants.

No. IP97–1914–C–T/G.

United States District Court, S.D. Indiana, Indianapolis Division.

June 16, 1999.

Robert B. Thompson, Harrington Thompson Acker Harrington, Chicago, IL, Douglas J. Webber, The Law Office of Doug Webber, Indianapolis, IN, for Plaintiffs.

John C. Duffey, Geoffrey L. Blazi, Russell H. Hart, Stuart & Branigin, Lafayette, IN, Brian J. Stephenson, Aronson & Cross, Chicago, IL, for Defendants.

**1.** The Secretary of Transportation has promulgated regulations regarding railroad grade crossing improvements through the FHWA under the FRSA and the Highway Safety Act of 1973, 23 U.S.C. § 130, including

## Entry on Defendant Norfolk and Western's Motion for Summary Judgment

TINDER, District Judge.

The Plaintiffs, Joseph J. Waymire and Linda Waymire, brought this action following a collision between an automobile and a train on which Joseph was the conductor. Defendant Norfolk and Western Railway Company ("NW") moves for summary judgment in its favor. The Waymires oppose the motion. The court rules as follows.

### I. Background

A train/motor vehicle collision occurred on June 28, 1996, at the intersection of NW's mainline tracks and McGalliard Street in Muncie, Indiana, giving rise to this action. A southbound NW train collided with an eastbound semi-tractor trailer rig stopped on the tracks. Joseph J. Waymire was employed by NW and was the conductor on the train involved in the collision.

At the time of the collision, the tracks in the vicinity of the McGalliard Street crossing were Class 4 tracks which carried a maximum permitted speed for freight trains of 60 m.p.h. The train was traveling at an approximate speed of 20 m.p.h. when the emergency brake was applied just before the collision. The cantilevered flashing warning light signals at the McGalliard Street crossing were operating at the time of the collision. These signals (or active warning devices) were placed into service on April 18, 1984, in connection with a signalization project of the City of Muncie, acting through the Indiana Department of Highways, and NW. The Federal Highway Administration ("FHWA") approved the signalization project and authorized the expenditure of federal funds to pay for the installation of the active warning devices at the grade crossing.[1]

23 C.F.R. § 646.214(b)(3) and (4). Pursuant to § 646.214(b)(3) and (4), a project for grade crossing improvement must include either an

## II. Discussion

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Material facts are those facts that might affect the outcome of the case under the governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The Defendant NW moves for summary judgment on Plaintiff Joseph Waymire's claims under the Federal Employers' Liability Act ("FELA"), 45 U.S.C. §§ 51–60, against it. (Linda Waymire asserts no claims against NW.) NW contends that the Federal Railway Safety Act of 1970 (the "FRSA"), 49 U.S.C. §§ 20101–21311, preempts Mr. Waymire's claims that NW negligently failed to provide him a safe place to work by failing to have controlled the speed of the train and failing to have considered favorably additional warnings of approaching trains at the McGalliard Street crossing.[2]

The determination of NW's summary judgment motion turns on the answer to the following question: Do the FRSA and regulations promulgated thereunder supersede allegations of unsafe train speed and inadequate warning devices in a FELA negligence action? To answer this question, the court must consider both the FELA and the FRSA. The FELA provides the exclusive remedy for an injury caused by "the negligence of [the railroad] . . . or by reason of any defect or insufficiency, due to its negligence, in its . . . equipment." 45 U.S.C. § 51. The stated

purpose of the FRSA "is to promote safety in every area of railroad operations and reduce railroad-related accidents and incidents." 49 U.S.C. § 20101. The FRSA contains an express preemption provision which provides:

> Laws, regulations, and orders related to railroad safety shall be nationally uniform to the extent practicable. A State may adopt or continue in force a law, regulation, or order related to railroad safety until the Secretary of Transportation prescribes a regulation or issues an order covering the subject matter of the State requirement.

49 U.S.C. § 20106. To ensure uniformity in railroad safety, the FRSA expressly authorizes the Secretary of Transportation to "prescribe regulations and issue orders for every area of railroad safety. . . ." 49 U.S.C. § 20103.

The Secretary has promulgated regulations under the FRSA setting maximum train speeds for certain classes of railroad track. *See* 49 C.F.R. § 213.9. The Secretary also has promulgated under the FRSA and the Highway Safety Act, through the Federal Highway Administration (FHWA), regulations regarding improvements to grade crossings and the use of particular warning devices at federally funded grade crossings. *See, e.g.,* 23 C.F.R. § 646.214. Regulations promulgated pursuant to the FRSA "may pre-empt any state law, rule, regulation, order, or standard relating to railroad safety." *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664, 113 S.Ct. 1732, 123 L.Ed.2d 387 (1993).

---

automatic gate or receive the approval of the FHWA.

**2.** NW asserts that on or about October 19, 1998, Mr. Waymire added another theory of negligence against it—that it was negligent in not taking steps to coordinate the timing and configuration of the traffic lights at the intersection of Broadway and McGalliard streets with the railway crossing lights at the intersection. (Def. NW Br. in Support of Mot. for

Summ. J. at 2 (citing Pl. Joseph J. Waymire's Additional Contention Against Def. NW.)) The court has searched for this Additional Contention cited by NW, but has been unable to locate it anywhere in the court's file. However, this third theory of negligence is not asserted in the Amended Complaint. Even if this theory were asserted in the Amended Complaint, like the second theory, it concerns the adequacy of the warning devices at the railroad crossing.

Mr. Waymire's FELA claims against NW, however, do not invoke the doctrine of federal pre-emption of a state law. Rather, the court is faced with the determination of which statute should give way when the FRSA and FELA are inconsistent. For the following reasons, the court concludes that when these two statutes are inconsistent, the FRSA supersedes the FELA in order to ensure uniformity in railway safety law.

### A. Train Speed Claim

In *Easterwood*, the Supreme Court held that the regulations adopted by the Secretary of Transportation under the FRSA pre-empted the plaintiff's state law negligence claim asserting that the defendant's train was traveling at an excessive speed where the train's speed was within the maximum limits set by the regulations. 507 U.S. at 676, 113 S.Ct. 1732. In so holding, the Court explained that although the regulation addressing speed, 49 C.F.R. § 213.9(a), appeared to set only maximum allowable speeds on certain types of tracks, when "[u]nderstood in the context of the overall structure of the regulations, the speed limits must be read as not only establishing a ceiling, but also precluding additional state regulation...." *Easterwood*, 507 U.S. at 675, 113 S.Ct. 1732. Thus, the court held that regulation § 213.9 covered the subject matter of train speed and precluded additional state regulation of train speed. *Id.*

Following *Easterwood*'s lead, two district courts have considered whether a railroad employee may maintain a FELA action alleging negligence as to train speed and have answered the question in the negative. *See Rice v. Cincinnati, New Orleans & Pac. Ry. Co.*, 955 F.Supp. 739, 740–41 (E.D.Ky.1997); *Thirkill v. J.B. Hunt Transp., Inc.*, 950 F.Supp. 1105, 1107 (N.D.Ala.1996); *but see Earwood v. Norfolk Southern Ry. Co.*, 845 F.Supp. 880 (N.D.Ga.1993). *Rice* and *Thirkill* are persuasive.

The *Rice* plaintiff, an engineer-trainee, allegedly suffered injuries when his train collided with a vehicle. He brought an action under FELA alleging that the train was traveling at an unsafe speed and that the grade crossing in question was unreasonably dangerous because of inadequate warning devices. The train was traveling within the maximum speed set by the regulations for the class of track. *See Rice*, 955 F.Supp. at 739–40. Recognizing that both the FELA and the FRSA were relevant, the court held that to the extent they are inconsistent, the FRSA supersedes the FELA "based on the policy embodied in the FRSA to ensure uniformity in law pertaining to railway safety." *Rice*, 955 F.Supp. at 740 (citing 49 U.S.C. § 20106). In so holding, the *Rice* court relied on *Easterwood's* analysis of the preemption of state law speed claims and reasoned:

As previously noted, this is not a state law case; the FELA is the sole remedy for this plaintiff. However, the same rationale that supports pre-emption of an unsafe speed argument in a state law case also indicates that speed regulations adopted pursuant to the FRSA should supersede an unsafe speed argument in this FELA case.

.     .     .     .     .

If a plaintiff were allowed to argue unsafe speed under the FELA but not under state law, the railroad safety uniformity intended by Congress would be compromised. The FRSA therefore supersedes plaintiff's FELA action insofar as it asserts that the train was traveling at an unsafe speed, provided that the speed is in keeping with the FRSA regulation.

*Id.* at 740–41. Because the train was traveling within the speed limits set by the FRSA and its regulations, the court held that the FRSA superseded the plaintiff's argument that the train was traveling at an unsafe speed. *Id.* Also relying on *Easterwood*, the *Rice* court held the FRSA superseded the plaintiff's argument in a FELA action that the warning devices at the grade crossing at issue were inadequate because federal funds were used to install the devices at the crossing. *See Rice*, 955 F.Supp. at 741.

In *Thirkill,* the plaintiff, a railroad engineer, brought a FELA action seeking damages for injuries received in a grade crossing collision with a truck. The train was traveling within the speed limit at the time of the collision, but the plaintiff alleged that the train speed contributed to his injuries. *See Thirkill,* 950 F.Supp. at 1106. The court noted that since the train was traveling within the speed set by the Secretary's regulations, any speed claim brought by the truck driver or the trucking company would be precluded under *Easterwood. See id.* at 1107. Relying on the Congressional policy of national uniformity of laws relating to railroad safety established by the FRSA and in furtherance of that uniformity, the court held that the same regulations applied to the plaintiff's FELA claims so that his train speed claim was precluded by the FRSA. *See Thirkill,* 950 F.Supp. at 1107.

■ This court agrees that the same rationale that supports pre-emption of state regulation of train speed supports the conclusion that speed regulations adopted under the FRSA supersede an unsafe speed argument in a FELA case. This conclusion finds support in congressional intent embodied in the FRSA's policy of ensuring national uniformity in railway safety laws. That uniformity may be achieved only when the same regulations covering train speed are applied to a plaintiff's negligence claims brought under the FELA as are applied to a plaintiff's state law negligence claims regarding train speed. To allow otherwise would create the dilemma that a railroad employee could bring a FELA action asserting negligent train speed, but a non-employee could not maintain state law actions asserting negligent train with respect to the same train traveling at one speed. Thus, the railroad safety regulations established under the FRSA would provide little guidance as to the safety standards to which the railroad could be held. The railroad could at one time be in compliance with federal railroad safety standards with respect to certain classes of plaintiffs yet be found negligent under the FELA with respect to other classes of plaintiffs for the very same conduct. So much for uniformity.

One district court has held to the contrary, but its decision is not persuasive. *See Earwood,* 845 F.Supp. at 885. The plaintiff, a railroad employee who was injured in a train-truck collision brought a FELA action alleging that the train was operating at an unsafe speed. *See Earwood,* 845 F.Supp. at 883. The *Earwood* court acknowledged that *Easterwood* would preempt a state law negligence claim of excessive speed but noted that the decision did not address FELA's impact on the FRSA. *Id.* at 885. The court explained that it did not have to decide whether one of these statutes superseded the other "[a]bsent an intolerable or irreconcilable conflict between [the] two...." *Id.* Finding no intolerable conflict between the two statutes, the court held that the FRSA did not preclude the plaintiff's FELA claims based on excessive speed because "the two statutes do not purport to cover the same areas." *Id.* It reasoned that the FRSA's regulations establish minimum safety requirements and that neither the FRSA or its regulations establish the standard of care the railroads owed to employees, whereas, the FELA is the exclusive remedy for an injured railroad employee to be interpreted broadly. The court also relied on cases in which the Railway Labor Act and Title VII have been held not to preclude FELA claims. *Id.*

On reconsideration, the *Earwood* court said the issue was not the interaction of the FELA and the FRSA but the impact of the FRSA's regulations on federal common law surrounding the FELA. *Id.* at 889–90. The court concluded that the FRSA's speed regulations did not preclude the FELA claims because the regulations "were not directed at the issue of employee safety." *Earwood,* 845 F.Supp. at 891. Again the court reasoned that the regulations established only minimum safety requirements and that railroads are held to a higher than minimum standard under the FELA. *Id.*

This court believes that *Earwood* was decided incorrectly. The FRSA, like the FELA, covers employee safety issues and the resulting standard of care railroads owe employees. The FRSA expressly states that its broad purpose is "to promote safety in *every area* of railroad operations and reduce railroad-related accidents and incidents." 49 U.S.C. § 20103(a) (emphasis added). Employee safety unquestionably is an area of railroad safety. Thus, employee safety in trains at railroad grade crossings is an area of railroad safety. As NW asserts, nothing in the FRSA suggests that railroad employees are excluded from its broad purpose.

Further, the FRSA's legislative history suggests that railroad employee safety was a significant motivation behind the FRSA's enactment. Before the FRSA's enactment, the Secretary of Transportation established a task force on railroad safety. The task force consisted of "representatives of the railroad industry, railroad labor organizations, and State regulatory commissions." H.R.Rep. No. 91–1194, *reprinted in* 1970 U.S.C.C.A.N. 4104, 4125. The task force advised the Secretary that "[e]mployee safety in railroad operations is of continuing concern," *id.* at 4127, and that "[r]ailroad operating personnel will continue to be the group most involved with rail safety, or the lack of it." *Id.* at 4128. The task force unanimously recommended broad federal regulation by the Secretary in the area of railroad safety "establishing safety standards in all areas of railroad safety...." *Id.* at 4129. The House Report recommending the passage of the FRSA stated that "[t]he primary purpose of this legislation... is to promote safety in *all areas* of railroad operations...." *Id.* at 4104 (emphasis added). The House Report relied upon the task force's recommendation and specifically noted the number of railroad employees killed or injured in railroad grade crossing accidents. *Id.* at 4106, 4108. Thus, legislative history indicates that the safety of railroad employees was a motivating concern and purpose behind enactment of the FRSA. Logic and common sense dictate that the regulations promulgated by the Secretary under the FRSA are directed at the issue of railroad safety, including railroad employee safety.

As to the *Earwood* court's conclusion that the regulations establish minimum safety standards, language in *Easterwood* suggests otherwise:

On their face, the provisions of [the speed regulation] address only the maximum speeds at which trains are permitted to travel given the nature of the track on which they operate. Nevertheless, related safety regulations adopted by the Secretary reveal that the limits were adopted only after the hazards posed by track conditions were taken into account. Understood in the context of the overall structure of the regulations, the speed limits must be read as not only establishing a ceiling, but also precluding additional state regulation of the sort respondent seeks to impose on petitioner.

*Easterwood*, 507 U.S. at 674, 113 S.Ct. 1732. As this passage indicates, the regulations do not set minimum safety requirements; rather, the FRSA and its regulations establish the federal safety standards in all areas of railroad safety. This necessarily includes the safety standards governing the railroads' actions with regard to their employees. Arguably then, to the extent federal common law would be inconsistent with the FRSA's speed regulations, the FRSA and its speed regulations preclude additional regulation under federal common law.

■ Mr. Waymire asserts, as did the *Earwood* court on reconsideration, that the issue is whether the FRSA abrogates federal common law negligence encompassing the FELA. In arguing that it does not, Mr. Waymire relies on language from *United States v. Texas*, 507 U.S. 529, 113 S.Ct. 1631, 123 L.Ed.2d 245 (1993), which addressed the abrogation of federal common law by a federal statute (the Debt Collection Act). The Court there explained:

"[s]tatutes which invade the common law ... are to be read with a presumption favoring the retention of long-established and familiar principles, except when a statutory purpose to the contrary is evident." In such cases, Congress does not write upon a clean slate. In order to abrogate a common law principle, the statute must "speak directly" to the question addressed by the common law. . . . "[C]ourts may take it as a given that Congress has legislated with an expectation that the [common law] principle will apply except 'when a statutory purpose to the contrary is evident.'"

507 U.S. at 534–5, 113 S.Ct. 1631 (internal citations omitted). Mr. Waymire contends that the FRSA does not speak directly to the questions addressed by common law because it does not state that it limits railroad employee FELA negligence claims, is not aimed at employee safety and establishes only minimum safety standards regarding train speed. The arguments concerning employee safety and minimum safety standards are rejected for the reasons stated *supra.*

■ As to his other argument, the FRSA's failure to state that it limits FELA negligence claims regarding train speed or warning devices is not fatal. "Congress need not 'affirmatively proscribe' the common-law doctrine at issue." *Texas,* 507 U.S. at 534, 113 S.Ct. 1631 (internal citations omitted). Instead, the inquiry is whether the statutory purpose evinces a congressional intent contrary to the federal common law. *See Texas,* 507 U.S. at 534, 113 S.Ct. 1631. This inquiry "involves an assessment of the scope of the legislation and whether the scheme established by Congress addresses the problem formerly governed by federal common law." *City of Milwaukee v. Illinois,* 451 U.S. 304, 315 n. 8, 101 S.Ct. 1784, 68 L.Ed.2d 114 (1981).

■ The FRSA's scope is quite broad: it was enacted to promote safety in all areas of railroad operations. To achieve this purpose, the FRSA grants the Secretary of Transportation broad powers to promulgate regulations for every area of railroad safety. 49 U.S.C. § 20103(a). Pursuant to that authority, regulations regarding train speeds and warning devices installed at federally funded grade crossing improvement projects were adopted. As the *Easterwood* Court indicated, these regulations "subsume the subject matter of the relevant state law," *Easterwood,* 507 U.S. at 664, 113 S.Ct. 1732. These regulations speak directly to the question formerly addressed by federal common law regarding safe train speeds and adequate warning devices. Thus, the FRSA evinces a congressional intent and statutory purpose, manifested through the regulations, to supplant federal common law on train speed and warning devices.

Mr. Waymire argues that case law, namely *Sheehy v. Southern Pacific Transportation Company,* 631 F.2d 649 (9th Cir. 1980), and *Mosco v. Baltimore & Ohio Railroad,* 817 F.2d 1088 (4th Cir.1987), establishes that the FRSA does not preclude FELA claims. These cases, however, are easily distinguishable because their facts are dissimilar and they involve the interaction of the FELA and federal statutes other than the FRSA. In *Sheehy,* a railroad employee sued his employer under the Federal Safety Appliance and Equipment Act, (the "FSAA"), 45 U.S.C. § 11, alleging that the railroad maintained a defective sill step. The FSAA requires all railroad cars to be equipped with "secure" sill steps. A regulation promulgated under the FSAA specified the proper physical location of sill steps. *See Sheehy,* 631 F.2d at 653. The court held that compliance with that regulation did not preclude the plaintiff's claim because the regulation covered the physical location of the step; it did not address whether a step could be found not secure and in violation of the FSAA for reasons other than its physical location, *e.g.,* the step was worn or bent. *See id.* Here, the train speed regulation clearly addresses whether the train's speed was excessive. The adequate warning devices regulation has a similarly clari-

ty. Thus, the regulations at issue in this case are unlike the regulation at issue in *Sheehy,* and that case provides no support for Mr. Waymire's train speed and inadequate warning devices claims.

In *Mosco,* a railroad employee was injured when a rock or similar object came through an open window of the locomotive striking him in the head. He sued his employer under the Federal Boiler Inspection Act (the "BIA"), § 45 U.S.C. 23 (1982), alleging that the windows should have been equipped with protective screens, bars, grates or similar devices. *See Mosco,* 817 F.2d at 1089. The defendant moved in limine to exclude evidence concerning the absence of such devices and the argument that their absence violated the BIA. The district court granted the motion, and the Fourth Circuit affirmed, concluding that the devices proposed by the plaintiff were not required or covered by the BIA or regulations. *Id.* at 1090–91. The court observed, however, that the plaintiff might have stated a claim under the FELA because devices "that do not fall within the coverage of the [BIA] Act are not therefore excluded from the usual rules of liability." *Id.* at 1092. In contrast, train speed and warning devices undisputably are within the coverage of the FRSA's regulations. Thus, Mr. Waymire's reliance on *Mosco* is misplaced.

It is undisputed that the train in this case was traveling within the maximum speed set for the track at issue by the applicable regulation. Thus, Mr. Waymire's FELA claim based upon an alleged excessive train speed is superseded by the FRSA and its applicable regulations.

### B. Grade Crossing Warning Devices Claim

The *Easterwood* Court also decided that certain regulations regarding railroad grade crossing improvements, when applicable, pre-empt state law negligence claims asserting that warning devices at grade crossings were inadequate. *See Easterwood,* 507 U.S. at 670, 113 S.Ct. 1732. One applicable regulation provides that for grade crossing improvement pro-

jects in which "Federal-aid funds participate in the installation of the devices," 23 C.F.R. § 646.214(b)(3) and (4), certain warning devices are to be installed. *See Easterwood,* 507 U.S. at 666, 113 S.Ct. 1732. For crossings that are not covered by § 646.214(b)(3), "the type of warning device to be installed, whether the determination is made by a State ... agency, and/or the railroad, is subject to the approval of the FHWA." 23 C.F.R. § 646.214(b)(4); *see also Easterwood,* 507 U.S. at 667, 670, 113 S.Ct. 1732. The Court concluded that §§ 214(b)(3) and (4) covered the subject matter of warning devices at grade crossings for projects in which federal funds participated in the installation of warning devices such that state regulation of such warning devices was preempted. *See id.* at 670–71, 113 S.Ct. 1732; *see also Thiele v. Norfolk & Western Ry. Co.,* 68 F.3d 179, 184–85 (7th Cir.1995) (holding § 646.214(b)(3) and (4) preempt state law adequacy of warnings claims when federal funds are used to install warning devices at crossings and devices are installed and fully operational); *accord Rice,* 955 F.Supp. at 741 (holding that the FRSA superseded the plaintiff's argument in a FELA action that the warning devices at the grade crossing at issue were inadequate because federal funds were used to install the devices at the crossing). The *Easterwood* court held, however, that these regulations did not preempt the plaintiff's grade crossing warning devices claim because the regulations were inapplicable to that case—the warning devices were not installed at the crossing and no federal funds were used for the grade crossing improvement project. *See id.* at 671–73, 113 S.Ct. 1732.

It is undisputed that the grade crossing improvement project for the crossing at issue was federally funded and approved by the Secretary's designee, the FHWA. The warning devices at the crossing were installed in that project and the warning devices were operational at the time of the collision. Therefore, Mr. Waymire's FELA claim asserting inadequate warning

devices at the crossing in question is superseded by the FRSA and its applicable regulations.

### III. Conclusion

Because Mr. Waymire's FELA claims against NW are superseded by the FRSA and its train speed and warning device regulations, NW's motion for summary judgment will be **GRANTED**, thus disposing of all claims against NW.

The claims against NW are separate and distinct from all of the Plaintiffs' other claims against the remaining Defendants. This ruling completely disposes of the case and all claims with respect to NW. This disposition has no bearing on the remaining claims in the case against the other defendants. As a result, there is no reason to delay a final adjudication of the claims against NW while awaiting disposition of the other claims.

The court, therefore, finds that there is no just reason for delay and that final judgment should be entered, pursuant to Fed. R.Civ.P. 54(b), in favor of the Defendant NW and against the Plaintiff Joseph J. Waymire. The Clerk of the Court is **DIRECTED** to enter judgment in accordance with this entry.