Norfolk Southern Railway Company ("Norfolk Southern") appeals from judgments entered on jury verdicts in two separate actions awarding James A. Martin *Page 551 
and Vernon L. Denson $575,000 and $225,000, respectively. We reverse and remand.
Virtually all the facts out of which these actions arose are undisputed. At approximately 2:55 p.m. on March 24, 1995, Martin and Denson, as engineer and conductor, respectively, were operating Norfolk Southern's locomotive number 8741. Martin and Denson had been employed by Norfolk Southern for 27 years and 30 years, respectively. Number 8741 was the lead locomotive on a train consisting of approximately 62 cars. The locomotive was travelling with the "nose," that is, the "short hood," forward. The temperature was in the "low 80s," the locomotive was not air conditioned, and the side windows were down.
As the train arrived in Fulton, at the point at which Norfolk Southern's track intersects Main Street, a tractor-trailer combination operated by Michael Weber and owned by his employer, Francis Powell Enterprises, Inc., attempted to cross the tracks in front of the train. When Martin realized that the truck was not going to stop for the train and that a collision was imminent, he instituted emergency procedures and lay down on the floor of the cab of the locomotive; Denson was already lying down.
The train struck the truck; it proceeded on down the track, dragging the truck and trailer for 1,642 feet before coming to a stop. However, the impact punctured the truck's fuel tank, and, approximately 450 feet from the point of impact, the fuel spilling from the tank ignited. As the train slowed, flames from the burning fuel began coming in the side windows. Consequently, Denson and Martin crawled to the back door to escape the heat. When Denson opened the door, he said, there was a "`poof' of fire" and flames began coming into the cab through the opened door.[1] (Reporter's Transcript, at 272.) Both men were severely burned.
They both sued Norfolk Southern, pursuant to the Federal Employers Liability Act, 45 U.S.C. § 51 et seq. ("FELA"), as well as Powell and others ("the truck defendants"). Martin and Denson eventually settled with the truck defendants for $625,000 and $275,000, respectively. In the trial of the remaining claims in the two actions, the jury considered only two theories of recovery against Norfolk Southern. First, the plaintiffs contended that in providing them with a locomotive that was not air conditioned, Norfolk Southern had failed to provide them a safe place to work. Second, they sought recovery under a theory that Norfolk Southern had failed to train them on how to protect themselves in the event of a collision.
In each case, the trial court denied Norfolk Southern's motions for a judgment as a matter of law as to both claims. The jury returned general verdicts in favor of each plaintiff, decreased by the amounts of the settlements with the truck defendants. To Martin, the jury awarded $575,000 ($1,200,000 [total damages] — $625,000 [received in settlement] = $575,000). To Denson, it awarded $225,000 ($500,000 [total damages] — $275,000 [received in settlement] = $225,000). Norfolk Southern moved for a judgment as a matter of law. When that motion was denied, Norfolk Southern appealed. The Association of American Railroads filed a brief in this Court as amicus curiae.
The appeal presents two dispositive issues. The first is whether the FELA imposes upon Norfolk Southern a duty to provide its conductors and engineers with air-conditioned locomotives. The second is whether the FELA imposed upon Norfolk Southern a duty to train the plaintiffs to take shelter in an area of the locomotive in which, in this case, they would not have *Page 552 
been exposed to flames entering the windows.
 I. Duty Under the FELA to Provide Air-Conditioned Locomotives
"The FELA provides the exclusive remedy for an injury caused by `the negligence of the [the railroad] . . . or by reason of any defect or insufficiency, due to its negligence, in its . . . equipment.'" Waymire v. Norfolk Western Ry., 65 F. Supp.2d 951,953 (S.D.Ind. 1999). "To prevail on an FELA negligence claim, the plaintiff must prove the traditional common law elements of negligence: duty, breach of that duty, foreseeability, and causation." CSX Transp., Inc. v. Dansby, 659 So.2d 35, 37
(Ala. 1995). "Pursuant to the FELA, a railroad company has the duty to provide its employees with a reasonably safe work environment; it must use reasonable care in fulfilling this duty."Id.
Under this theory of recovery, the plaintiffs reason as follows: (1) the FELA imposes a duty upon Norfolk Southern to provide a safe place to work; (2) because locomotive 8741 was not air conditioned, it was being operated with the windows down; (3) because the windows were down, the flames entered the windows and burned the plaintiffs; (4) because locomotive 8741 was not air conditioned, it was not a safe place to work; and, therefore, (5) the FELA imposes a duty upon Norfolk Southern to equip its locomotives with air conditioning, and it breached that duty in this case.
"While federal law governs the substantive rights of the parties in FELA cases, procedural matters are governed by applicable state rules when [the cases are] tried in state court."Mitchell v. Missouri-Kansas-Texas R.R., 786 S.W.2d 659, 661
(Tex.), cert. denied sub nom., Missouri Pacific R.R. v. Mitchell,498 U.S. 896 (1990). The rule in Alabama is that the court, rather than the jury, determines the existence of a duty. StateFarm Fire Cas. Co. v. Owen, 729 So.2d 834 (Ala. 1998). This rule is procedural in nature; it is not a substantive right. 786 S.W.2d at 661. Thus, whether the FELA imposes a duty upon Norfolk Southern to provide its conductors and engineers with air-conditioned locomotives is a question this Court must decide as a matter of law.
In deciding that question, we do not write on a clean slate. The issues before us involve matters that are heavily regulated by Congress. See, e.g., the Federal Railway Safety Act of 1970,49 U.S.C. § 20101 et seq. (the "FRSA"), and the Federal Locomotive Inspection Act, 49 U.S.C. § 20701 et seq. (the "FLIA") (formerly, the Boiler Inspection Act).
We do not overlook the fact that these actions were based on the FELA, and, therefore, that they do not involve a question of federal preemption of a state-law claim. Instead, we are applying federal common law as informed by Congressional and federal administrative actions. Nevertheless, the issues before us involve policy considerations that closely parallel those involved in preemption cases.
One of the primary goals of preemption is uniformity. "Through the Supremacy Clause of the United States Constitution, Congress may induce uniformity of regulation and eliminate barriers among states by preemption of state regulation." Christi Davis Douglas M. Branson, Interstate Compacts in Commerce andIndustry: A Proposal for "Common Markets Among States," 23 Vt. L. Rev. 133, 135 (1998) (footnote omitted). "Congress frequently states uniformity to be both the goal of its substantive federal legislation and its purpose in enacting express preemption provisions, and the language of those provisions [reflects] the uniformity goal. The examples of ERISA, the FRSA and the Vehicle Safety Act are illustrative." Susan J. Stabile, Preemption ofState Law by Federal Law: A Task for Congress or the Courts?, 40 Vill. L. Rev. 1, 19 (1995) (emphasis added). *Page 553 
Indeed, the FRSA provides in pertinent part:
 "[§ 20101] The purpose of this chapter is to promote safety in every area of railroad operations and reduce railroad-related accidents and incidents."
 "[§ 20103] (a) The Secretary of Transportation, as necessary, shall prescribe regulations and issue orders for every area of railroad safety supplementing laws and regulations in effect on October 16, 1970."
 "[§ 20106] Laws, regulations, and orders related to railroad safety shall be nationally uniform to the extent practicable. A State may adopt or continue in force a law, regulation, or order related to railroad safety until the Secretary of Transportation prescribes a regulation or issues an order covering the subject matter of the State requirement. A State may adopt or continue in force an additional or more stringent law, regulation, or order related to railroad safety when the law, regulation, or order —
 "(1) is necessary to eliminate or reduce an essentially local safety hazard;
 "(2) is not incompatible with a law, regulation, or order of the United States Government; and
"(3) does not unreasonably burden interstate commerce."
(Emphasis added.) See also Burlington Northern Santa Fe Ry. v.Doyle, 186 F.3d 790, 794 (7th Cir. 1999) ("The FRSA also advanced the goal of national uniformity of regulation because [§ 20106] expressly preempts state laws regulating rail safety.");Springston v. Consolidated Rail Corp, 130 F.3d 241, 245 (6th Cir. 1997) ("Federal law preempts plaintiff's claims based upon the need for extra-statutory warning devices on the train."); IllinoisCent. R.R. v. Fordice, 30 F. Supp.2d 945, 955 (S.D.Miss. 1997); ("to ensure national uniformity of all laws and standards relating to railroad safety, the FRSA includes a broad preemption provision"); O'Bannon v. Union Pacific R.R., 960 F. Supp. 1411,1416 (W.D.Mo. 1997) (the FRSA's "preemption clause expresses a preference for national uniformity").
The promotion of national uniformity in locomotive-safety regulation was also one of the primary goals of the FLIA and its predecessor, the Boiler Inspection Act, 38 Stat. 1192, codified asamended, 49 U.S.C. § 20701-03. Section 20701 provides:
 "A railroad carrier may use or allow to be used a locomotive or tender on its railroad line only when the locomotive or tender and its parts and appurtenances —
 "(1) are in proper condition and safe to operate without unnecessary danger of personal injury;
 "(2) have been inspected as required under this chapter and regulations prescribed by the Secretary of Transportation under this chapter; and
 "(3) can withstand every test prescribed by the Secretary under this chapter."
(Emphasis added.)
In Napier v. Atlantic Coast Line R.R., 272 U.S. 605 (1926), the United States Supreme Court considered "whether the Boiler Inspection Act ha[d] occupied the field of regulating locomotive equipment used on a highway of interstate commerce, so as to preclude state legislation." Id. at 607. Napier dealt with appeals from actions challenging two state laws that purported to require certain accessories on locomotives. Specifically, a Georgia statute required locomotives to be equipped with an "automatic door to the firebox," and a Wisconsin statute required a "cab curtain." Id. Thus, each action "sought to enjoin state officials from enforcing . . . a state law which prohibit[ed] use within the State *Page 554 
of locomotives not equipped with the device prescribed." Id.
The Court noted that "[e]ach device was prescribed by the State primarily to promote the health and comfort of engineers and firemen." Id. at 610 (emphasis added). Regarding the "automatic fire door," the Court said:
 "The automatic fire-door conserves the health of the fireman by protecting him from exposures to extremes of heat and cold while performing his duties; conserves his eyesight by reducing the amount and extent of exposure to the glare of the fire; protects the safety of the employees in the event of an explosion in the fire-box; and incidentally might affect the safety of the train, after such an explosion, in that employees, being safe, might be able to bring the train under control. The automatic fire-door would also serve to protect travellers upon highways crossed by the railroad at grade. For the fireman is required to aid the engineer in keeping a lookout; and with use of the old type swinging door this is not continuously possible. The glare of the flame when the door is open practically blinds the fireman for a time."
Id. at 609-10. Regarding the "cab curtain," the Court said:
 "Various types of cab curtains had been voluntarily installed by the carriers. But those installed by most of the carriers were such that snow entered the cabs in large quantities; that it saturated the clothing of engineers and firemen; and that the exposure caused great discomfort and danger of serious illness. The [Wisconsin] State [Railroad] Commission found that the plans for cab curtains submitted by the several carriers were, with one exception, not `fully suitable and effective for the protection of the health, comfort and welfare of the engine men'; and ordered particular requirements."
Id. at 610.
Notwithstanding the laudable purposes of these accessories, the Court held that the state laws were preempted by the Boiler Inspection Act, the predecessor to the FLIA, and were, therefore, invalid. It reasoned that the scope of the federal statute "`include[d] the entire locomotive and tender and all parts and appurtenances thereof,'" id. at 608, and that Congress had conferred upon the Interstate Commerce Commission, not only the duty to "inspect," but to "prescribe the rules and regulations by which fitness for service shall be determined." Id. at 612 (emphasis added). "Thus," said the Court, "the [Interstate Commerce] Commission sets the standard."[2] Id. (emphasis added). The Court explained that "[i]f the protection now afforded by the Commission's rules is deemed inadequate, application for relief must be made to it." Id. at 613.
Napier is still controlling authority for the proposition that the FRA, acting through the Administrator, see supra, note 1, "sets the standard" by which a locomotive's "fitness for service shall be determined." 272 U.S. at 612. Indeed, Napier's "broad preemptive sweep is necessary to maintain uniformity of railroad operating standards across *Page 555 
state lines." Law v. General Motors Corp., 114 F.3d 908, 910
(9th Cir. 1997); see also Scheiding v. General Motors Corp.,22 Cal.4th 471, 481, 993 P.2d 996,93 Cal.Rptr.2d 342, 349 (2000) ("Napier has long established [that] Congress `intended to occupy the field' of locomotive equipment").
It is essentially undisputed that if these claims were based on state law, they would be preempted by the FLIA and the FRSA. The plaintiffs remind us that this is an action based on federal — not state — law. Thus, they contend, the doctrine of preemption is inapposite. We disagree with that contention. The practical effect of such a rule would be identical whether the rule is based on a state statute or on this Court's interpretation of federal law. Indeed, the need for uniformity, which is one of the bases of preemption, has been addressed by the Federal Railroad Administrator ("the Administrator") in a context analogous to the one before us.
On March 10, 1978, the Administrator issued a "Policy Statement," in which he "address[ed] jurisdictional issues arising with respect to the operations of common carriers in the general system of rail transportation." 43 Fed. Reg. 10584, 10585. More specifically, the Policy Statement attempted to define the boundary between the area of responsibility occupied by the Federal Railroad Administration ("the FRA") and that occupied by the Occupational Safety and Health Administration ("OSHA").[3]
The Administrator identified three subject areas that are the particular concern of the FRA, namely, "(1) track, roadbed, and associated devices and structures, (2) equipment and (3) human factors." Id. at 10585.
The clear implication of the Policy Statement was that the FRA intended to exert its statutory authority to regulate in those three subject areas to the exclusion of OSHA. For example, it stated:
 "FRA has now exercised its statutory authority with respect to each of these regulatory fields by actual rulemaking. While it is expected that additional regulatory initiatives may be undertaken, as necessary, in each of the major regulatory fields, it is the judgment of the agency that piecemeal regulation of individual hazards in any of the three regulatory fields by any other agency of government would be disruptive and contrary to the public interest. Should it be demonstrated that further specific regulatory action is required prior to the completion of an FRA rulemaking addressing a given class of hazards within one of the three major fields, FRA will not hesitate to employ its emergency powers or to initiate special-purpose proceedings directed to the solution of individual problems.
". . . .
 ". . . As the primary regulatory agency concerned with railroad safety, FRA will not hesitate to adopt its own standards to assure a safe environment for railroad operations and to promote regulatory consistency."
Id. at 10586-87 (emphasis added).
A particular subject area as to which the Administrator expressed his intention to occupy the field was "in respect to thedesign of locomotives and other rolling equipment used on a railroad." Id. at 10587 (emphasis added). The Administrator referred specifically to the "windows of locomotive cabs," as falling within the FRA's responsibility to enforce the safety provisions of the FLIA and the FRSA. Id. at 10586. He noted (1) that "[p]ublic comment ha[d] been requested on the need for improved glazing materials in windows of locomotive cabs" and (2) that "[a] broad survey of railroad operating rules and *Page 556 
practices (including employee training and testing) ha[d] been initiated", and he stated: "As the primary regulatory agency in the area of railroad operations, it will be the responsibility of FRAto evaluate what further Federal action may be required." Id. (emphasis added).
Since the publication of this Policy Statement, the Administrator has followed through on his suggestion that further regulations and evaluations would be forthcoming. On March 31, 1980, for example, the FRA promulgated a comprehensive and detailed set of regulations and specifications relating to the equipment of locomotives. 45 Fed. Reg. 21109, codified asamended, 49 C.F.R. § 229.1 et seq. Although the regulations address certain aspects of cab environment, such as, "windows," § 229.119(b), and "ventilation," § 229.119(d), neither they, nor any other regulations promulgated by the FRA, require air conditioning. It would be inconsistent with the sense of the FRA as to its jurisdiction to hold that the judiciary could supersede the FRA's regulations by requiring common carriers to equip their locomotives with air conditioning. Whether the impetus for change comes through another federal agency, such as OSHA, or through the judiciary's construing the FELA, the impetus constitutes an intrusion into the FRA's regulatory authority.
Moreover, the plaintiffs have cited no cases holding that the FELA requires railroads to equip their locomotives with air conditioning and we are not convinced that such a requirement would be adopted by jurisdictions universally, and we question whether it would be the proper role of the judiciary to adopt or impose such a requirement. To be sure, the plaintiffs have citedWeaver v. Missouri Pacific R.R., 152 F.3d 427 (5th Cir. 1998), and Palmer v. Union Pacific R.R., 12 F. Supp.2d 588 (S.D.Tex. 1998). However, those cases involved claims that the FELA required railroads to equip their locomotives with air conditioning or protective screens in order to protect the operators from projectiles, such as, rocks, bottles, or bullets. We know of no case holding — as the plaintiffs urge us to do — that the FELA simply requires railroads to air condition their locomotives. Thus, were this Court to hold that the FELA carries such a requirement, the uniformity that is jealously guarded by the FRA, and on which various federal policies are grounded, would be destroyed. Under such a construction of the FELA, locomotives operating in Alabama would have to be air conditioned, while those operating in neighboring states would not. The territorial conflict created by judicial caprice would constitute the "piecemeal regulation of individual hazards" of the sort eschewed by the FRA. 43 Fed. Reg. at 10586.
Another factor we consider is the cost to the carrier of complying with such a holding in relation to the benefit sought. Specifically, the evidence demonstrated that in 1992 the cost of equipping a locomotive with air conditioning would have been between $12,000 and $16,000. (Reporter's Transcript, at 406.) Thus, the modifications proposed by the plaintiffs are not incidental, but substantial. However, the evidence also suggested that fires resulting from crossing collisions are relatively rare. For example, Martin testified that he has been involved in crossing accidents with "more than 75 automobiles and 6 trucks" (Reporter's Transcript, at 202), but that only one of those accidents resulted in a fire. In our view, questions relating to the relationship of cost and benefit require an analysis for which the FRA is peculiarly adept and appropriately suited.
For these reasons, we refuse to hold that locomotives operating in Alabama must be air conditioned. Instead, on the authority of Napier and the body of federal statutes and published specifications that regulate locomotives and their accessories, we hold that Norfolk Southern had no duty under the FELA to equip its locomotives with air conditioning. The trial court erred, therefore, in denying Norfolk *Page 557 
Southern's motion for a judgment as a matter of law on this claim.
 II. Duty to Train
The plaintiffs next contend that the FELA imposed upon Norfolk Southern a duty to train the plaintiffs (as engineer and conductor) to take shelter in an area of the locomotive in which — in this case — they would not have been exposed to flames entering the windows. In support of this claim, they presented the testimony of a "consulting engineer," William R. Bogett. In their case in chief, the plaintiffs repeatedly attempted to elicit an opinion from Bogett "as to whether or not training should be provided to employees of railroads who operate locomotive engines, insofar as what they should do when involved in such a collision." (Reporter's Transcript, at 435.) Norfolk Southern objected to Bogett's offering such an opinion, on the ground that Bogett had no "experience with respect to either the operation of a locomotive [or] the training of personnel." The trial court sustained Norfolk Southern's objections. Thus, the plaintiffs offered no testimony as to what training railroads were required to provide their locomotive operators.
Nevertheless, over Norfolk Southern's objection, Bogett was allowed to state that, in his opinion, the safest place for locomotive operators to be when facing an imminent collision is in the "vestibule," that is, in the front of the locomotive, near thepoint of impact. More specifically, he testified:
 "Q. [By plaintiffs' counsel] And Dr. Bogett, do you have an opinion as to which part of the locomotive would be the safest part for a crew member to go to in the event they are about to be involved in a road-crossing collision?
"A. Yes.
"Q. Can you tell us what that is?
 "A. It would depend on the vehicle that you were getting ready to strike, that was the impending collision. If it was small and low, such as an automobile, you are probably just as well off staying in your seat. I would say [that for] a larger vehicle you need to be in the center of the cab, up forward, preferably in the vestibule on the short hood.
". . . .
"Q. When you say `vestibule,' what are you talking about?
 "A. I mean there is a room that is to the front of the cab, between the cab and the trailer compartment, that is tight and confining, that would maintain your position far better than in the large volume in the cab. And in the event of a derailment and roll over it would continue from both frontal impact and from subsequent run-ins from cars catching up to you because of that, or brake application. It would help protect you from any intruding materials."
(Reporter's Transcript, at 436-37.)
As this excerpt from Bogett's testimony demonstrates, his opinion addressed only the possibility of injury from bruises andcontusions as a result of being cast about the cab, or as a result of being speared or crushed by objects intruding into the cab. It is undisputed that the plaintiffs did not suffer injuries of these kinds. The only injuries the plaintiffs complain of are their burns. But Bogett offered no opinion as to where locomotive operators should go to protect themselves from fire, as in this case.
Moreover, Bogett conceded that the best position for locomotive personnel to assume depends on the kind of collision
that is imminent. He testified, in other words, that one rule cannot cover all contingencies. Indeed, during the testimony of William E. Honeycutt, an officer of Norfolk Southern ("assistant vice-president, operating rules"), Norfolk Southern introduced a photograph of a locomotive that had apparently struck a log truck. The "vestibule" section of that locomotive had been *Page 558 obliterated. According to Honeycutt's opinion — if any was needed on that point — had the operators of that locomotive been in the vestibule section, they, too, would have been destroyed.
In this case, the plaintiffs sought to protect themselves from the impending collision by lying down on the floor. Martin testified that this was a precaution he had learned from more experienced locomotive operators. Indeed, the plaintiffs were veterans of numerous crossing accidents.
Denson testified that in only one other crossing accident had he been injured; in that accident he had suffered a sprained ankle. He stated that, even after the accident out of which these present cases arose, he continued to lie down on the floor when faced with an imminent collision, because, he stated, he "found that that is a good place to go . . . when . . . a truck is about to cause a collision with [his] train." (Reporter's Transcript, at 376.) In short, there was a complete failure of proof as to the existence of a duty on the part of Norfolk Southern to instruct these plaintiffs in any manner material to this case.
Given the way these cases are postured, we refuse to hold that Norfolk Southern had a duty to instruct Martin and Denson to go to the vestibule — the area of the locomotive nearest the point of impact. Consequently, the trial court erred in denying Norfolk Southern's motion for a judgment as a matter of law on the plaintiffs' claim alleging the breach of such a duty.
 III. Conclusion
The judgments of the trial court are reversed, and these causes are remanded for disposition consistent with this opinion.
1981364 — REVERSED AND REMANDED.
1981365 — REVERSED AND REMANDED.
Hooper, C.J., and Maddox, Houston, Lyons, Brown, Johnstone, and England, JJ., concur.
See, J., concurs in the result.
[1] The only significant factual dispute in this case involves the extent to which Denson and Martin were directly threatened by the flames that were coming in the window, that is, the extent to which they were endangered before Denson opened the door.
[2] The Interstate Commerce Commission exercised this authority until 1966. On October 15, 1966, Congress created the Federal Railroad Administration. Pub.L. 89-670, 80 Stat. 932, pertinentportions codified as amended, 49 U.S.C. § 103(a)-(c). Its purpose was to "carry out all railroad safety laws of the United States."Id. At the head of the FRA is the "Federal Railroad Administrator," § 103(b), to whom was delegated the responsibility theretofore vested in the Secretary of Transportation to "ensur[e] that the laws are uniformly administered and enforced." Section 103(a). See also 49 C.F.R. § 1.49(c)(6) and (m). As to the FLIA, specifically, the Administrator is to "[c]arry out the . . . laws relating generally to safety appliances and equipment on railroad engines and cars, and protection of employees and travelers." Section 1.49(c). See Association of American Railroads v.Department of Transp., 198 F.3d 944 (D.C. Cir. 1999).
[3] "OSHA `is the agency of the U.S. Department of Labor which administers the Occupational Safety and Health Act [of 1970] (29 U.S.C. § 651 et seq.) which provides for the establishment of safety and health standards generally.'" Caro-Galvan v. CurtisRichardson, Inc., 993 F.2d 1500, 1511 n. 23 (11th Cir. 1993).