JOURNAL ENTRY AND OPINION
{¶ 1} This is an appeal by appellant Forest L. Darby and several co-plaintiffs/appellants (collectively, "the Darby Group") from an order of Visiting Judge Harry Hanna that denied their motion to amend their complaint for asbestos-related personal injury claims. The Darby Group claims it was error to find the Federal Locomotive Boiler Inspection Act ("BIA") preempted their right to amend their complaint to name appellees Viad Corporation, the alleged successor-in-interest to locomotive manufacturer Baldwin-Lima-Hamilton, Inc., (Viad"), and Old Orchard Industrial Corp., individually and as successor-in-interest to Vapor Corporation, ("Vapor"), an alleged manufacturer of asbestos-containing locomotive parts, as defendants. [emphasis added for clarity of change] We affirm.
 {¶ 2} The Darby Group are former railroad company employees asserting claims that, through their employment, they were exposed to asbestos-containing products and contracted occupational diseases as a result. They moved to add Viad as the sixty-first and sixty-second defendants on the theory that, respectively as manufacturers of locomotives or of asbestos-containing component parts of railroad locomotives, such as brakes, insulated wire, gaskets, and others, Viad and Vapor were potentially liable for injuries sustained by them. While separate entities, for the sake of efficiency, Viad and Vapor will hereinafter be jointly referenced simply as "Viad." [emphasis added for clarity of change]
 {¶ 3} The Darby Group asserted that while some of them were exposed to asbestos in the course of on-line railroad operations, others were exposed while engaged as repair personnel for engines at maintenance facilities. Following briefs and a hearing, the motion was denied with a Civ.R. 54(B) "no just reason for delay" notation, allowing this interlocutory appeal to proceed. On appeal, as below, the Darby Group contends that it should have been permitted to amend its complaint for six main reasons: (1) the judge failed to adhere to the legal maxim that preemption of state law is strongly disfavored; (2)that the BIA only applies to injury claims sustained from locomotives "in use" and not those in repair facilities; (3) that railroad repair shops are specifically governed by the Occupational Health and Safety Administration Act, which preserves state law claims; (4) that the BIA, under the facts of this case, only applies to railroad employers and not manufacturers of locomotive parts; (5) that Congress, in enacting the original BIA in 1911, could not have envisioned barring the tort claims The Darby Group wish to assert, which did not then exist and; (6) that recent Supreme Court case precedent urges against preemption under the facts of this case.
 {¶ 4} "`Article VI of the Constitution provides that the laws of the United States "shall be the supreme Law of the Land; . . . any Thing in the Constitution or Laws of any state to the Contrary notwithstanding." * * * Thus, since [the United States Supreme Court's] decision in McCulloch v. Maryland, * * * it has been settled that state law that conflicts with federal law is `without effect. * * * Consideration of issues arising under the Supremacy Clause "starts with the assumption that the historic police powers of the States [are] not to be superseded by . . . Federal Act unless that [is] the clear and manifest purpose of Congress."' Accordingly, "the purpose of Congress is the ultimate touchstone" of preemption analysis. * * *.
 {¶ 5} "Congress' intent may be `explicitly stated in the statute's language or implicitly contained in its structure and purpose.' * * * In the absence of an express congressional command, state law is pre-empted if that law actually conflicts with federal law, * * * or if federal law so thoroughly occupies a legislative field `as to make reasonable the inference that Congress left no room for the States to supplement it.'"[1]
 {¶ 6} According to the plain language of 49 U.S.C. § 20701, "A railroad carrier may use or allow to be used a locomotive or tender on its railroad line only when the locomotive or tender and its parts andappurtenances —
 {¶ 7} "(1) are in proper condition and safe to operate without unnecessary danger of personal injury;
 {¶ 8} "(2) have been inspected as required under this chapter [49 U.S.C.S §§ 20701 et seq.] and regulations prescribed by the Secretary of Transportation under this chapter [49 U.S.C.S §§ 20701
et seq.]; and
 {¶ 9} "(3) can withstand every test prescribed by the Secretary under this chapter [49 U.S.C.S §§ 20701 et seq.], (emphasis added)."
 {¶ 10} The United States Supreme Court has held that, in enacting the BIA, the manifest intent of Congress was to pre-empt the field of regulation concerning "* * * the design, the construction and the material of every part of the locomotive and tender and of all appurtenances."[2] This principle has been upheld by all federal circuit courts to visit the issue, as well as the Tenth District Court of Appeals Of Ohio.[3] "This broad preemptive sweep is necessary to maintain uniformity of railroad operating standards across state lines. Locomotives are designed to travel long distances, with most railroad routes wending through interstate commerce. The virtue of uniform national regulation `is self evident: locomotive companies need only concern themselves with one set of equipment regulations and need not be prepared to remove or add equipment as they travel from state to state. * * * (citations omitted).'"[4]
 {¶ 11} The Darby Group's argument to the contrary notwithstanding, it was appropriate to disregard any presumption against preemption in denying the motion to amend the complaint; case law is overwhelmingly supportive of an interpretation that the BIA completely preempted state law on requirements imposed upon locomotive parts, or materials used in such parts.
 {¶ 12} Next, The Darby Group contends that locomotives technically not "in use" at the time they cause injury are not covered by the BIA and, therefore, the act may not preclude state tort actions against the manufacturer of a potentially hazardous part or material in a locomotive repair facility.
 {¶ 13} The Darby Group supports this proposition with cases brought under the Federal Employer Liability Act, 45 U.S. 51 ("FELA"), the mechanism under which railroad workers may seek redress from their employers for injuries occurring at work. If the injury was the result of a BIA violation, the employer is strictly liable for its worker's damages and cannot assert a comparative negligence defense.[5] If the injury is not the result of a BIA violation, the worker must prove negligence on the part of the employer and any comparative negligence on his part reduces any damages he may be awarded.[6] It is in that context that the BIA may apply or not apply.
 {¶ 14} These FELA cases do not undermine the preclusive application of the BIA, they refer to the advantage given an injured worker over the employer when the injury resulted from a BIA violation, as opposed to non-BIA related incidents where it is necessary to establish the employer's negligence as the proximate cause of the injury and examine the worker's lack of due care. Whether the BIA "applies" in FELA claims, therefore, has no bearing in a preemption analysis directed to the locomotive part or materials manufacturers at issue here. Whether a locomotive is off-line in a repair shop or moving interstate, the BIA preempts state tort law, and the FELA replaces it in the railroad workplace environment.
 {¶ 15} It is The Darby Group's contention that, since the Federal Railroad Safety Administration, under the Federal Secretary of Transportation, has acquiesced, in part, to Occupational Safety and Health Administration monitoring and enforcing of general repair facility workplace safety, common law state tort actions for any repair shop injury occurring are not preempted by the BIA.
 {¶ 16} In Southern Railway Co. v. Occupational Safety and HealthReview Comm.,[7] OSHA inspected and cited a railyard for ten workplace safety infractions. In rejecting the railroad's defense of BIA preemption, the court noted that BIA had not established very many general safety regulations applicable to an employer's railyard as opposed to other federal safety regulations specific to the employer as a common carrier:
 {¶ 17} "OSHA was enacted in response to an appalling record of death and disability in our industrial environment, and it was the clear intendment of Congress to meet the problem with broad and, hopefully, effective legislation. The declared purpose of the Act was `to assure so far as possible every working man and woman in the Nation safe and healthful working conditions and to preserve our human resources.'29 U.S.C. § 651(b). `Since the statute does not, on its face, provide an answer to the specific question [before us] * * * reference to the statutory purpose behind the Act is especially necessary to arrive at an interpretation of the statute consistent with the objectives Congress sought to achieve through this legislation.' * * * Additionally, the scope of the Congressional objective requires that this `remedial social legislation * * * be construed liberally in favor of the workers whom it was designed to protect, and any exemption from its terms must be narrowly construed.' * * * Accordingly, the exemptive statute should appropriately be construed to achieve the maximum protection for the industrial workers of the Nation.
 {¶ 18} "In our opinion the industry-wide exemption urged upon us by Southern would fly in the face of these principles and objectives. The safety regulations of the Department of Transportation are confined almost exclusively to those areas of the railway industry which affect over-the-road operations such as locomotives, rolling stock, signal installations, road beds and related facilities. * * * While the regulatory program in these areas reflects a concern for the safety of the employees, it is directed primarily toward the general safety of transportation operations. On the other hand, the Department of Transportation and FRA do not purport to regulate the occupational health and safety aspects of railroad offices or shop and repair facilities. To read the exemptive statute in a manner which would leave thousands of workers in these non-operational areas of the railway industry exposed to unregulated industrial hazards would, in our opinion, utterly frustrate the legislative purpose."[8]
 {¶ 19} Under OSHA, at 29 U.S.C. § 653(4)(b)(4):
 {¶ 20} "Nothing in this Act shall be construed to supersede or in any manner affect any workmen's compensation law or to enlarge or diminish or affect in any other manner the common law or statutory rights, duties, or liabilities of employers and employees under any law
with respect to injuries, diseases, or death of employees arising out of, or in the course of, employment. (emphasis added.)"
 {¶ 21} This statute, however, by its explicit language, only limits OSHA's own ability to restrict remedies for workplace injury, and does not affect the preemptive effect the BIA enjoys relative to railroad locomotive parts or materials. The FRA has announced its intention to maintain control, pursuant to its statutory authority, "in respect to the design of locomotives and other rolling equipment used on a railroad."[9]
The scope of preemption under the BIA has been announced, in relevant part, by the U.S. Supreme Court as encompassing "whatever in fact is an integral or essential part of a completed locomotive * * *."[10] If Congress evidences an intent to occupy a given field, any state law falling within that field is pre-empted.[11]
 {¶ 22} 29 U.S.C. § 653(b)(1) provides: "[n]othing in this Act shall apply to working conditions of employees with respect to which other Federal agencies, * * * exercise statutory authority to prescribe or enforce standards or regulations affecting occupational safety or health." Regulations of the material used to construct a locomotive or a part thereof, can clearly relate to occupational safety and is clearly within the zone of preemption of the BIA. With its express preemption of the regulation of the parts and materials used on locomotives, and its professed intention to do so, the BIA prohibits any interference by OSHA, because OSHA is concerned with non-specialized workplace safety concerns that do not take into account the FRA's duty, under the BIA, to ensure uniform regulation of locomotive parts and materials throughout the United States.
 {¶ 23} The Darby Group next advocates that, because the BIA, by its express terms, only includes railroad carriers, that manufacturers of parts and materials used in constructing locomotives are necessarily excluded from its preemptive reach. We disagree. The Second, Sixth, and Ninth Circuit Federal Courts have explicitly addressed, and rejected, this conclusion.
 {¶ 24} "Although the word `manufacturer' does not appear in the BIA, the scope of the Act includes both the `design' and `construction' of a locomotive's parts. * * * Two other circuits have addressed the issue of whether the BIA includes manufacturers, and we agree with their conclusion that it does. * * * Where, as here, the design and construction of a part are in the hands of a manufacturer, the results that Congress had hoped to obtain through the BIA would be accomplished best by including the manufacturer within the statute's coverage.
 {¶ 25} "[The Plaintiff's] contention that the BIA serves only to preempt state statutory enactments but not common law remedies is equally unavailing. In reaching this conclusion, we again agree with the two other circuits that have addressed this issue. * * * This holding is necessary to keep the locus of regulation at the federal level and maintain the uniformity that is a goal of the BIA. As the [United States] Supreme Court has noted, an award of damages can act as a `potent method of governing conduct and controlling policy.' * * * For a locomotive carrier or manufacturer, the source of the damages, whether statutory or common law, is irrelevant, and both must therefore be preempted by the BIA."[12]
 {¶ 26} Were we to accept The Darby Group's position, regulation of the materials used in locomotive parts would transfer to whatever state imposed the most stringent product design and composition standards upon manufacturers, because national compliance could only be effected by complying with the state offering the most exposure to liability.[13]
Since the BIA expressly grants the Department of Transportation the authority to promulgate regulations regarding inspection and mandated testing of locomotives, a harsher state requirement would conflict and, therefore, be of no effect, considering Napier's express determination that the BIA preempts the field regarding materials and parts used in assembling locomotives.
 {¶ 27} The Darby Group next contends that, absent privity, common law or statutory products liability claims against parts manufacturers did not exist in 1911 when the original BIA was enacted, so Congress could not have intended to preempt them. This argument overlooks the fact that the BIA was passed to ensure that common rail carriers operated under a single set of regulations to ensure workplace safety in an historically dangerous environment, national uniformity of infrastructure and ease of interstate movement. Its primary focus was not to restrict an injured worker's redress. The "field" of preemption contemplated by Congress, as found by Napier, was, in part, any law dealing with the design and material used for every part of a locomotive, to whatever purpose.
 {¶ 28} Finally, the Darby Group claims that, notwithstanding the BIA, Silkwood v. Kerr-McGee Corp.,[14] and Medtronic, Inc. v. Lohr,[15]
specifically support a finding that Viad would be appropriate defendants for their claims of tort liability. In Silkwood, the plaintiff's daughter was injured by exposure to dangerous levels of radiation in a nuclear laboratory and the defense, asserting that the Atomic Energy Act retained exclusive jurisdiction over the regulation and operation of nuclear power facilities, claimed that the father was not entitled to punitive damages. In Medtronic, the plaintiff sued a medical device manufacturer when her pacemaker failed, and the defendant argued that the Medical Device Amendments of 1976 precluded recovery for state tort claims because the tort claims involved determining requirements for medical devices outside of the Federal approval process.
 {¶ 29} The United States Supreme Court noted in both cases that tort remedies are primarily state-oriented remedies which should not be foreclosed through preemption absent explicit congressional intent. In each case, it placed great emphasis on the lack of a demonstrated intent by Congress to foreclose state tort remedies; on the tangential effect state tort suits would have on the ability of the federal government to carry out its intended function in enacting the respective laws it did; and on the absence of any recovery at all for the plaintiffs, should preemption be found.
 {¶ 30} Such is not the case here. The Darby Group has recourse under a specifically enacted Federal scheme of recovery: the FELA. In addition, permitting product liability claims against manufacturers of the asbestos-containing locomotive components here would directly, and could, potentially, seriously impact the ability of the FRA to control the specifications of components on locomotives traveling on its uniform, nationwide tracks. Considering the importance placed on uniformity in a nationwide rail network and the availability of a remedy for Darby and his co-plaintiffs, we think preemption of claims against manufacturers is the wiser course.
Judgment affirmed.
It is ordered that appellee shall recover of appellant costs herein taxed.
The court finds that there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the Cuyahoga County Common Pleas Court to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
PATRICIA A. BLACKMON, P.J., CONCURS.
TERRENCE O'DONNELL, J., CONCURS IN JUDGMENT ONLY.
[1] Cippollone v. Liggett Group, Inc. (1992), 505 U.S. 504, 516
(internal citations omitted).
[2] Napier v. Atlantic Coast Line R.R. Co. (1926), 272 U.S. 605,611.
[3] E.g., Springston v. Consolidated Rail Corp. (6th Cir., 1997),130 F.3d 241, 245, Law v. General Motors Corp. (9th Cir., 1997),114 F.3d 908, 910, Ogelsby v. Delaware Delaware Hudson Ry. (2nd Cir., 1999), 180 F.3d 458, 460; see also, Carter v. Consolidated RailCorp. (1998), 126 Ohio App.3d 177.
[4] Law v. General Motors Corp. (1997), 114 F.3d 908, 910.
[5] E.g. Urie v. Thompson (1949), 337 U.S. 163, Crockett v. Long IslandR.R. (2nd Cir., 1995), 65 F.3d 274, Holfester v. Long Island R.R. (2d Cir. 1966), 360 F.2d 369, 371; see also Topping v. CSX Transportation,Inc., (4th Cir. 1993), 1 F.3d 260, 261.
[6] 45 U.S.C. § 51.
[7] (4th Cir., 1976), 539 F.2d 335.
[8] Id at 338.
[9] Norfolk Southern Ry. Co. v. Denson (2000), 774 So.2d 549, citing43 Fed. Reg. 10587.
[10] Southern Railway Co. v. Lunsford (1936), 297 U.S. 398.
[11] Silkwood v. Kerr-McGee Corp. (1984), 464 U.S. 238, 248.
[12] Oglesby, supra, 180 F.3d at 462.
[13] Law, supra, 114 F.3d at 911-912.
[14] (1984), 464 U.S. 238.
[15] (1996), 518 U.S. 470.